# TOLL, PRESIDENT, UNIVERSITY OF MARYLAND, ET AL. *v.* MORENO ET AL.

No. 80–2178.   Argued March 2, 1982—Decided June 28, 1982

1

2

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 19. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, *post*, p. 24. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 25.

*Robert A. Zarnoch*, Assistant Attorney General of Maryland, argued the cause for petitioners. With him on the briefs was *Stephen H. Sachs*, Attorney General.

*James R. Bieke* argued the cause for respondents. With him on the brief was *John Townsend Rich.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by the Attorneys General for their respective States as follows: *Charles A. Graddick* of Alabama, *Wilson L. Condon* of Alaska, *Robert K. Corbin* of Arizona, *John Steven Clark* of Arkansas, *George Deukmejian* of California, *J. D. MacFarlane* of Colorado, *Carl R. Ajello* of Connecticut, *Richard S. Gebelein* of Delaware, *Jim Smith* of Florida, *Arthur K. Bolton* of Georgia, *Tany S. Hong* of Hawaii, *David H. Leroy* of Idaho, *Tyrone C. Fahner* of Illinois, *Linley E. Pearson* of Indiana, *Thomas J. Miller* of Iowa, *Robert T. Stephan* of Kansas, *Steven L. Beshear* of Kentucky, *William J. Guste, Jr.,* of Louisiana, *James E. Tierney* of Maine, *Francis X. Bellotti* of Massachusetts, *Frank J. Kelley* of Michigan, *Warren R. Spannaus* of Minnesota, *William A. Allain* of Mississippi, *John D. Ashcroft* of Missouri, *Michael T. Greely* of Montana, *Paul L. Douglas* of Nebraska, *Richard H. Bryan* of Nevada, *Gregory H. Smith* of New Hampshire, *James R. Zazzali* of New Jersey, *Jeff Bingaman* of New Mexico, *Robert Abrams* of New York, *Rufus L. Edmisten* of North Carolina, *Robert Wefald* of North Dakota, *William J. Brown* of Ohio, *Jan Eric Cartwright* of Oklahoma, *Dave Frohnmayer* of Oregon, *LeRoy S. Zimmerman* of Pennsylvania, *Dennis J. Roberts II* of Rhode Island, *Daniel R. McLeod*

JUSTICE BRENNAN delivered the opinion of the Court.

The state-operated University of Maryland grants preferential treatment for purposes of tuition and fees to students with "in-state" status. Although citizens and immigrant aliens may obtain in-state status upon a showing of domicile within the State, nonimmigrant aliens, even if domiciled, are not eligible for such status. The question in this case is whether the University's in-state policy is invalid under the Supremacy Clause of the Constitution, insofar as the policy categorically denies in-state status to domiciled nonimmigrant aliens who hold G–4 visas.

## I

The factual and procedural background of this case, which has prompted two prior decisions of this Court, requires some elaboration. The focus of the controversy has been a policy adopted by the University in 1973 governing the eligibility of students for in-state status with respect to admission and fees. The policy provides in relevant part:

> "1. It is the policy of the University of Maryland to grant in-state status for admission, tuition and charge-differential purposes to United States citizens, and to immigrant aliens lawfully admitted for permanent residence in accordance with the laws of the United States, in the following cases:

of South Carolina, *Mark V. Meierhenry* of South Dakota, *William J. Leech, Jr.*, of Tennessee, *Mark White* of Texas, *David L. Wilkinson* of Utah, *John J. Easton* of Vermont, *J. Marshall Coleman* of Virginia, *Kenneth O. Eikenberry* of Washington, *Chauncey H. Browning* of West Virginia, *Bronson C. La Follette* of Wisconsin, and *Steven Freudenthal* of Wyoming; and for the American Council on Education et al. by *Sheldon Elliot Steinbach.*

*Bruce J. Ennis, Donald N. Bersoff*, and *Paul R. Friedman* filed a brief for the International Bank for Reconstruction and Development et al. as *amici curiae* urging affirmance.

"a. Where a student is financially dependent upon a parent, parents, or spouse domiciled in Maryland for at least six consecutive months prior to the last day available for registration for the forthcoming semester.

"b. Where a student is financially independent for at least the preceding twelve months, and provided the student has maintained his domicile in Maryland for at least six consecutive months immediately prior to the last day available for registration for the forthcoming semester." App. to Pet. for Cert. 167a–168a.

In 1975, when this action was filed, respondents Juan Carlos Moreno, Juan Pablo Otero, and Clare B. Hogg were students at the University of Maryland. Each resided with, and was financially dependent on, a parent who was a nonimmigrant alien holding a "G–4" visa. Such visas are issued to nonimmigrant aliens who are officers or employees of certain international organizations, and to members of their immediate families. 66 Stat. 168, 8 U. S. C. § 1101(a)(15)(G)(iv).[1] Despite respondents' residence in the State, the University denied them in-state status pursuant to its policy of excluding all nonimmigrant aliens. Seeking declaratory and injunctive relief, the three respondents filed a class action against the University of Maryland and its President.[2] They contended that the University's policy violated various federal laws, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and the Supremacy Clause.

---

[1] The international organizations covered by the provision are those that are entitled to the privileges, exemptions, and immunities conferred under the International Organizations Immunities Act, 59 Stat. 669, 22 U. S. C. § 288 et seq. At the time suit was brought, the named plaintiffs in this case were dependents of employees of either the Inter-American Development Bank or the International Bank for Reconstruction and Development (World Bank).

[2] A fourth individual, Rene Otero, Jr., a respondent in this Court, was made a named plaintiff in 1980 when a supplemental complaint was filed.

The District Court granted partial summary judgment in favor of the three named plaintiffs and the class of G–4 visaholders represented by them.[3]   In the view of the District Court, the University's denial of in-state status to these plaintiffs rested upon an irrebuttable presumption that a G–4 alien cannot establish Maryland domicile.   Concluding that the presumption was "not universally true" as a matter of either federal or Maryland law, the District Court held that under *Vlandis* v. *Kline*, 412 U. S. 441 (1973), the in-state policy violated the Due Process Clause of the Fourteenth Amendment.   *Moreno* v. *University of Maryland*, 420 F. Supp. 541, 559 (Md. 1976).   Accordingly, in an order dated July 13, 1976, the District Court enjoined the President of the University[4] from denying respondents the opportunity to establish in-state status *solely* on the basis of an "irrebuttable presumption of non-domicile." *Id.*, at 565.[5]   The court stayed its order pending appeal in reliance on the University's representation that it would make appropriate refunds "in the event the Court's Order of July 13, 1976, were finally affirmed on appeal."   App. to Pet. for Cert. 100a. The Court of Appeals for the Fourth Circuit affirmed, adopt-

---

[3] The court certified a class of G–4 visaholders or their dependents who, "residing in Maryland, . . . are current students at the University of Maryland, or . . . chose not to apply to the University of Maryland because of the challenged policies but would now be interested in attending if given an opportunity to establish 'in-state' status, or . . . are currently students in senior high schools in Maryland." *Moreno* v. *University of Maryland*, 420 F. Supp. 541, 563 (Md. 1976).

[4] Citing *Monroe* v. *Pape*, 365 U. S. 167 (1961), the District Court dismissed the claim against the University itself.   420 F. Supp., at 548–550. The plaintiffs did not appeal that dismissal.

[5] The District Court did not order the University to grant the named plaintiffs in-state status.   Rather, it merely barred the University from denying them and the members of the class "the opportunity to demonstrate that they or any of them are entitled to 'in-state' status for purposes of tuition and charge differential determinations." *Id.*, at 565.

ing the reasoning of the District Court. *Id.*, at 102a.[6] Affirmance order reported at 556 F. 2d 573 (1977).

We reviewed the case on writ of certiorari. *Elkins* v. *Moreno*, 435 U. S. 647 (1978). We held that "[b]ecause petitioner makes domicile the 'paramount' policy consideration and because respondents' contention is that they can be domiciled in Maryland but are conclusively presumed to be unable to do so, this case is squarely within *Vlandis* as limited by [*Weinberger* v.] *Salfi*, [422 U. S. 749 (1975)]." *Id.*, at 660.[7] It was therefore necessary to decide whether the presumption was universally true. With respect to federal law, we concluded that G–4 visaholders could "adopt the United States as their domicile." *Id.*, at 666.[8] We were thus left with the "potentially dispositive" question whether G–4 aliens are as a matter of state law incapable of becoming domiciliaries of Maryland. We certified this question to the Maryland Court of Appeals.[9] The state court answered the

[6] The Court of Appeals stayed its mandate "on the same terms as the district court originally granted its stay." App. to Pet. for Cert. 103a–104a.

[7] *Salfi* limited *Vlandis* "to those situations in which a State 'purport[s] to be concerned with [domicile, but] at the same time den[ies] to one seeking to meet its test of [domicile] the opportunity to show factors clearly bearing on that issue.'" *Elkins* v. *Moreno*, 435 U. S., at 660, quoting *Weinberger* v. *Salfi*, 422 U. S. 749, 771 (1975).

[8] We noted that as to some categories of nonimmigrant aliens, Congress had "expressly conditioned admission . . . on an intent not to abandon a foreign residence or, by implication, on an intent not to seek domicile in the United States." 435 U. S., at 665. See, *e. g.*, 8 U. S. C. §§ 1101(a)(15)(B), (F), (H). With respect to G–4 nonimmigrant aliens, however, we concluded that Congress had deliberately declined to "impose restrictions on intent," thereby permitting them to "adopt the United States as their domicile." 435 U. S., at 666.

[9] The certified question was phrased as follows:

"Are persons residing in Maryland who hold or are named in a visa under 8 U. S. C. § 1101(a)(15)(G)(iv) (1976 ed.), or who are financially dependent upon a person holding or named in such a visa, incapable as a matter of state law of becoming domiciliaries of Maryland?" *Id.*, at 668–669 (footnote omitted).

certified question in the negative, advising us that "nothing in the general Maryland law of domicile renders G–4 visa holders, or their dependents, incapable of becoming domiciled in this State." *Toll* v. *Moreno*, 284 Md. 425, 444, 397 A. 2d 1009, 1019 (1979).

After our certification, but before the state court's response, the University adopted a "clarifying resolution" concerning its in-state policy.[10]   By its terms the resolution did not offer a new definition of "in-state" students; rather, it purported to "reaffirm" the existing policy.[11]   The resolution indicated, however, that the University's policy, "insofar as it denies in-state status to nonimmigrant aliens, serves a number of substantial purposes and interests, whether or not it conforms to the generally or otherwise applicable definition of domicile under the Maryland common law."   App. to Pet. for Cert. 173a.   The interests assertedly served by the policy were described in the following terms:

> "(a) limiting the University's expenditures by granting a higher subsidy toward the expenses of providing educational services to that class of persons who, as a class, are more likely to have a close affinity to the State and to contribute more to its economic well-being;
>
> "(b) achieving equalization between the affected classes of the expenses of providing educational services;
>
> "(c) efficiently administering the University's in-state determination and appeals process; and

---

[10] It was entitled "A Resolution Clarifying the Purposes, Meaning, and Application of the Policy of the University of Maryland for Determination of In-State Status for Admission, Tuition, and Charge-Differential Purposes, Insofar as It Denies In-State Status to Nonimmigrant Aliens." App. to Pet. for Cert. 172a.

[11] *"Reaffirmation of In-State Policy.*   Regardless of whether or not the policy approved by the Board of Regents on September 21, 1973, conforms with the generally or otherwise applicable definition of domicile under the Maryland common law, the Board of Regents reaffirms that policy . . . ." *Id.*, at 174a.

"(d) preventing disparate treatment among categories of nonimmigrants with respect to admissions, tuition, and charge-differentials." *Id.*, at 173a–174a.

Following the Maryland Court of Appeals' decision, the case returned to this Court. But we declined to restore the case to the active docket for full briefing and argument, concluding that the University's clarifying resolution had "fundamentally altered the posture of the case." *Toll* v. *Moreno*, 441 U. S. 458, 461 (1979) *(per curiam).* We noted that "if domicile [was] not the 'paramount' policy consideration of the University, this case [was] no longer 'squarely within *Vlandis* as limited by *Salfi*,'" and thus raised "new issues of constitutional law which should be addressed in the first instance by the District Court." *Id.*, at 461–462, quoting *Elkins* v. *Moreno, supra,* at 660.[12] Accordingly, we vacated the judgment of the Court of Appeals and remanded the case "to the District Court for further consideration in light of our opinion and judgment in *Elkins*, the opinion and judgment of the Maryland Court of Appeals in *Toll*, and the Board of Regents' clarifying resolution of June 23, 1978." 441 U. S., at 462.

On remand, the District Court determined that the clarifying resolution constituted a change in the University's position. Before that resolution, the University's primary concern had in fact been domicile; after the resolution, domicile was no longer "the paramount consideration in the University's policy." 480 F. Supp. 1116, 1124 (Md. 1979). Thus,

---

[12] We further noted:

"Our decision in *Elkins* rests on the premise that 'the University apparently has no interest in continuing to deny in-state status to G–4 aliens as a class if they can become Maryland domiciliaries since it has indicated both here and in the District Court that it would redraft its policy "to accommodate" G–4 aliens were the Maryland courts to hold that G–4 aliens can' acquire such domicile. 435 U. S., at 661. After the clarifying resolution, this premise no longer appears to be true." 441 U. S., at 461.

with respect to the period preceding the issuance of the resolution, the District Court reaffirmed its earlier determination that insofar as the policy precluded G–4 aliens (or their dependents) from acquiring in-state status, it denied due process under *Vlandis*. 480 F. Supp., at 1122–1125. With respect to the period following the promulgation of the resolution, however, the court held that *Vlandis* did not control: The University had abandoned its position that G–4 aliens could not establish domicile in Maryland. 480 F. Supp., at 1125. Nevertheless, the District Court concluded that the revised in-state policy was constitutionally invalid, basing its conclusion on two alternative grounds. First, the court held that the policy ran afoul of the Equal Protection Clause of the Fourteenth Amendment. According to the court, the challenged portion of the University's policy contained a classification based on alienage, requiring strict scrutiny, an analysis which the policy did not survive, since the policy did not further any compelling interest. 489 F. Supp. 658, 660–667 (Md. 1980). Alternatively, the court held that the in-state policy violated the Supremacy Clause by encroaching upon Congress' prerogatives with respect to the regulation of immigration. *Id.*, at 667–668.[13]

The Court of Appeals affirmed for "reasons sufficiently stated" by the District Court. *Moreno* v. *University of Maryland*, 645 F. 2d 217, 220 (1981) *(per curiam)*. We granted certiorari. 454 U. S. 815 (1981). For the reasons that follow, we hold that the University of Maryland's in-state policy, as applied to G–4 aliens and their dependents, violates the Supremacy Clause of the Constitution,[14] and on

---

[13] The District Court's pre-emption holding rested in part on its equal protection analysis; according to the court, "the standard utilized to uphold a state regulation dealing with benefits to be accorded to aliens is essentially the strict scrutiny analysis" of equal protection. 489 F. Supp., at 668.

[14] "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made,

that ground affirm the judgment of the Court of Appeals. We therefore have no occasion to consider whether the policy violates the Due Process or Equal Protection Clauses.

## II

Our cases have long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders. See, *e. g., Mathews* v. *Diaz,* 426 U. S. 67 (1976); *Graham* v. *Richardson,* 403 U. S. 365, 377–380 (1971); *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410, 418–420 (1948); *Hines* v. *Davidowitz,* 312 U. S. 52, 62–68 (1941); *Truax* v. *Raich,* 239 U. S. 33, 42 (1915). Federal authority to regulate the status of aliens derives from various sources, including the Federal Government's power "[t]o establish [a] uniform Rule of Naturalization," U. S. Const., Art. I, §8, cl. 4, its power "[t]o regulate Commerce with foreign Nations", *id.,* cl. 3, and its broad authority over foreign affairs, see *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304, 318 (1936); *Mathews* v. *Diaz, supra,* at 81, n. 17; *Harisiades* v. *Shaughnessy,* 342 U. S. 580, 588–589 (1952).

Not surprisingly, therefore, our cases have also been at pains to note the substantial limitations upon the authority of the States in making classifications based upon alienage. In *Takahashi* v. *Fish & Game Comm'n, supra,* we considered a California statute that precluded aliens who were "ineligible for citizenship under federal law" from obtaining commercial fishing licenses, even though they "met all other state requirements" and were lawful inhabitants of the State. 334 U. S., at 414.[15] In seeking to defend the statute, the State

---

under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2.

[15] At the time *Takahashi* was decided, federal law "permitted Japanese and certain other non-white racial groups to enter and reside in the coun-

argued that it had "simply followed the Federal Government's lead" in classifying certain persons as "ineligible for citizenship." *Id.*, at 418. We rejected the argument, stressing the delicate nature of the federal-state relationship in regulating aliens:

> "The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. Under the Constitution the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states. *State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid.*" *Id.*, at 419 (emphasis added) (citation and footnote omitted).[16]

---

try, but . . . made them ineligible for United States citizenship." 334 U. S., at 412 (footnote omitted).

[16] JUSTICE REHNQUIST, in dissent, suggests that the italicized language should not be interpreted literally. *Post*, at 28–29. Rather, he suggests, the language can only be understood as explaining three prior Court cases that *Takahashi* cited in a footnote immediately after the italicized language. 334 U. S., at 419, n. 6, citing *Truax* v. *Raich*, 239 U. S. 33 (1915), *Chy Lung* v. *Freeman*, 92 U. S. 275, 280 (1876), and *Hines* v. *Davidowitz*, 312 U. S. 52, 65–68 (1941). According to JUSTICE REHNQUIST, "in each of these cases, the Court found either a clear encroachment on exclusive federal power to admit aliens into the country or a clear conflict with a specific congressional purpose." *Post*, at 29. JUSTICE REHNQUIST thus concludes that the language in *Takahashi* does not mean what it says; instead it means that absent a clear encroachment on exclusive federal power or clear conflict with a federal statute, the States are free to treat aliens as they will. JUSTICE REHNQUIST is wrong. If the language were read in the manner suggested by the dissent, it would fail to explain *Takahashi*

12

The decision in *Graham* v. *Richardson, supra,* followed directly from *Takahashi.* In *Graham* we held that a State may not withhold welfare benefits from resident aliens "merely because of their alienage." 403 U. S., at 378. Such discrimination, the Court concluded, would not only violate the Equal Protection Clause, but would also encroach upon federal authority over lawfully admitted aliens. In support of the latter conclusion, the Court noted that Congress had "not seen fit to impose any burden or restriction on aliens who become indigent after their entry into the United States," *id.,* at 377, but rather had chosen to afford "lawfully admitted resident aliens . . . the full and equal benefit of all state laws for the security of persons and property," *id.,* at 378. The States had thus imposed an "auxiliary burde[n] upon the entrance or residence of aliens" that was never contemplated by Congress. *Id.,* at 379.

Read together, *Takahashi* and *Graham* stand for the broad principle [17] that "state regulation not congressionally sanc-

---

itself: The California statute at issue in *Takahashi,* denying certain lawful aliens the right to obtain commercial fishing licenses from the State, presented neither "a clear encroachment on exclusive federal power to admit aliens" nor "a clear conflict with a specific congressional purpose." JUSTICE REHNQUIST's *non*literal interpretation of the *Takahashi* holding is simply wishful thinking on his part.

While pre-emption played a significant role in the Court's analysis in *Takahashi,* the actual basis for invalidation of the California statute was apparently the Equal Protection Clause of the Constitution. Commentators have noted, however, that many of the Court's decisions concerning alienage classifications, such as *Takahashi,* are better explained in pre-emption than in equal protection terms. See, *e. g.,* Perry, Modern Equal Protection: A Conceptualization and Appraisal, 79 Colum. L. Rev. 1023, 1060–1065 (1979); Note, The Equal Treatment of Aliens: Preemption or Equal Protection?, 31 Stan. L. Rev. 1069 (1979).

[17] Our cases do recognize, however, that a State, in the course of defining its political community, may, in appropriate circumstances, limit the participation of noncitizens in the States' political and governmental functions. See, *e. g., Cabell* v. *Chavez-Salido,* 454 U. S. 432 (1982); *Ambach* v. *Norwick,* 441 U. S. 68, 72–75 (1979); *Foley* v. *Connelie,* 435 U. S. 291, 295–296 (1978); *Sugarman* v. *Dougall,* 413 U. S. 634, 646–649 (1973).

tioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress." *De Canas* v. *Bica,* 424 U. S. 351, 358, n. 6 (1976).[18]   To be sure, when Congress has done nothing more than permit a class of aliens to enter the country temporarily, the proper application of the principle is likely to be a matter of some dispute.   But the instant case does not present such a situation, and there can be little doubt regarding the invalidity of the challenged portion of the University's in-state policy.

The Immigration and Nationality Act of 1952, 66 Stat. 163, as amended, 8 U. S. C. § 1101 *et seq.* (1976 ed. and Supp. IV), represents "a comprehensive and complete code covering all aspects of admission of aliens to this country, whether for business or pleasure, or as immigrants seeking to become permanent residents." *Elkins* v. *Moreno,* 435 U. S., at 664. The Act recognizes two basic classes of aliens, immigrant and nonimmigrant.[19]   With respect to the nonimmigrant class,

---

[18] In *De Canas,* we considered whether a California statute making it unlawful in some circumstances to employ *illegal* aliens was invalid under the Supremacy Clause.   We upheld the statute.   JUSTICE REHNQUIST's dissent in the present case suggests that the pre-emption claim was rejected in *De Canas* because "the Court found no strong evidence that Congress intended to pre-empt" the State's action.   *Post,* at 31.   JUSTICE REHNQUIST has misread *De Canas.*   We rejected the pre-emption claim not because of an absence of congressional intent to pre-empt, but because Congress *intended* that the States be allowed, "to the extent consistent with federal law, [to] regulate the employment of illegal aliens."   424 U. S., at 361.

[19] Immigrant aliens are subject to stricter qualitative tests than nonimmigrant aliens.   See E. Harper, Immigration Laws of the United States 228 (3d ed. 1975).   And whereas there are no quantitative restrictions on the admission of nonimmigrant aliens, there are, with a few exceptions, quota limitations for immigrant aliens.   See 8 U. S. C. § 1151(a) (1976 ed., Supp. IV); Harper, *supra,* at 228.   As we noted in *Elkins* v. *Moreno:*

"Congress defined nonimmigrant classes to provide for the needs of international diplomacy, tourism, and commerce, each of which requires that aliens be admitted to the United States from time to time and all of which would be hampered if every alien entering the United States were subject

the Act establishes various categories, the G–4 category among them. For many of these nonimmigrant categories, Congress has precluded the covered alien from establishing domicile in the United States. *Id.*, at 665.[20] But significantly, Congress has allowed G–4 aliens—employees of various international organizations, and their immediate families—to enter the country on terms permitting the establishment of domicile in the United States. *Id.*, at 666. In light of Congress' explicit decision not to bar G–4 aliens from acquiring domicile, the State's decision to deny "instate" status to G–4 aliens, *solely* on account of the G–4 alien's federal immigration status, surely amounts to an ancillary "burden not contemplated by Congress" in admitting these aliens to the United States. We need not rely, however, simply on Congress' decision to permit the G–4 alien to establish domicile in this country; the Federal Government has also taken the additional affirmative step of conferring special tax privileges on G–4 aliens.

As a result of an array of treaties, international agreements, and federal statutes, G–4 visaholders employed by the international organizations described in 8 U. S. C. § 1101(a)(15)(G)(iv) are relieved of federal and, in many instances, state and local taxes on the salaries paid by the organizations. For example, the international agreements governing the international banks for which the parents of the named respondents are employed specifically exempt the parents from all taxes on their organizational salaries. See Articles of Agreement of the International Bank for Reconstruction and Development, Art. VII, § 9(b), 60 Stat. 1458, T. I. A. S. No. 1502 (1945) ("No tax shall be levied on or in respect of salaries and emoluments paid by the Bank to ex-

---

to a quota and to the more strict entry conditions placed on immigrant aliens." 435 U. S., at 665 (footnote omitted).

[20] See, *e. g.*, 8 U. S. C. § 1101(a)(15)(B) (temporary visitors for pleasure or business); § 1101(a)(15)(C) (aliens in transit); § 1101(a)(15)(F) (foreign students); § 1101(a)(15)(H) (temporary workers).

ecutive directors, alternates, officials or employees of the Bank who are not local citizens, local subjects, or other local nationals"); Agreement Establishing the Inter-American Development Bank, Art. XI, § 9(b), [1959] 10 U. S. T. 3029, 3096, T. I. A. S. No. 4397 (1959) ("No tax shall be levied on or in respect of salaries and emoluments paid by the Bank to . . . employees of the Bank who are not local citizens or other local nationals").[21]   Not only have some of the specific tax exemptions contained in international agreements been incorporated into a federal statute, see 22 U. S. C. § 286h, but also the International Organizations Immunities Act has explicitly afforded a federal tax exemption for those G–4 visaholders employed by international organizations for which no treaty or international agreement has provided a tax exemption for foreign employees.[22]   § 4(b), 59 Stat. 670, reenacted, 68A Stat. 284, as § 893 of the Internal Revenue

---

[21] Among the similar agreements pertaining to other international organizations are the following: Articles of Agreement of the International Finance Corporation, Art. VI, § 9(b), [1956] 7 U. S. T. 2197, 2216, T. I. A. S. No. 3620 (1955) ("No tax shall be levied on or in respect of salaries and emoluments paid by the Corporation to . . . employees of the Corporation who are not local citizens, local subjects, or other local nationals"); Articles of Agreement of the International Development Association, Art. VIII, § 9(b), [1960] 11 U. S. T. 2284, 2306, T. I. A. S. No. 4607 (1960) ("No tax shall be levied on or in respect of salaries and emoluments paid by the Association to . . . employees of the Association who are not local citizens, local subjects, or other local nationals"); Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, Art. 24, § 2, [1966] 17 U. S. T. 1270, 1279, T. I. A. S. No. 6090 (1965) ("Except in the case of local nationals, no tax shall be levied . . . on or in respect of salaries, expense allowances or other emoluments paid by the Centre to officials or employees of the Secretariat"); Articles of Agreement of the International Monetary Fund, Art. IX, § 9(b), 60 Stat. 1414, T. I. A. S. No. 1501 (1945) ("No tax shall be levied on or in respect of salaries and emoluments paid by the Fund to . . . employees of the Fund who are not local citizens, local subjects, or other local nationals").

[22] And by virtue of Md. Ann. Code, Art. 81, § 280(a) (1980), this group of G–4 visaholders is able to shield organizational income from Maryland income tax.

Code of 1954, 26 U. S. C. § 893 ("Wages, fees, or salary of any employee [except citizens of the United States and of the Republic of the Philippines] of . . . an international organization . . . , received as compensation for official services to such . . . international organization shall not be included in gross income and shall be exempt from [federal] taxation").

In affording G–4 visaholders such tax exemption, the Federal Government has undoubtedly sought to benefit the employing international organizations by enabling them to pay salaries not encumbered by the full panoply of taxes, thereby lowering the organizations' costs. See 41 Op. Atty. Gen. 170, 172–173 (1954). The tax benefits serve as an inducement for these organizations to locate significant operations in the United States. See, *e. g.*, H. R. Rep. No. 1203, 79th Cong., 1st Sess., 2–3 (1945); S. Rep. No. 861, 79th Cong., 1st Sess., 2–3 (1945). By imposing on those G–4 aliens who are domiciled in Maryland higher tuition and fees than are imposed on other domiciliaries of the State, the University's policy frustrates these federal policies. Petitioners' very argument in this Court only buttresses this conclusion. One of the grounds on which petitioners have sought to *justify* the discriminatory burden imposed on the named respondents is that the salaries their parents receive from the international banks for which they work are exempt from Maryland income tax. Indeed, petitioners suggest that the "dollar differential . . . at stake here [is] an amount roughly equivalent to the amount of state income tax an international bank parent is spared by treaty each year." Brief for Petitioners 23 (footnote omitted). But to the extent this is indeed a justification for the University's policy with respect to the named respondents, it is an impermissible one: The State may not recoup indirectly from respondents' parents the taxes that the Federal Government has expressly barred the State from collecting.[23]

---

[23] Petitioners point out that the international banks for which the named respondents' parents work provide reimbursement for the difference be-

In sum, the Federal Government has not merely admitted G–4 aliens into the country; it has also permitted them to establish domicile and afforded significant tax exemptions on organizational salaries. In such circumstances, we cannot conclude that Congress ever contemplated that a State, in the operation of a university, might impose discriminatory tuition charges and fees solely on account of the federal immigration classification.[24] We therefore conclude that insofar as it bars domiciled G–4 aliens (and their dependents) from acquiring in-state status, the University's policy violates the Supremacy Clause.[25]

## III

Finally, we must address petitioners' contention that the Eleventh Amendment precluded the District Court from ordering the University to pay refunds to various class members who would have obtained in-state status but for the stay of the District Court's original order of July 13, 1976. As petitioners concede, in seeking a stay of that order the Univer-

---

tween in-state and out-of-state tuition. Certainly, this fact does not assist—but undermines—petitioners' argument. Such reimbursements only add to the employment costs of the international organizations, thereby frustrating the federal intention of benefiting the international organizations.

[24] Some members of the class represented by the respondents derive their state tax exemption not from a treaty or international agreement, but from the combination of federal and state statutes. See *supra*, at 15–16, and n. 22. As to these G–4 aliens, it is true, as the dissent notes, *post*, at 34–35, that the Federal Government has not precluded the collection of a state income tax that is imposed on domiciliaries of the State. But even with respect to this group of G–4 aliens, the Federal Government has taken the affirmative steps of permitting the establishment of domicile and of providing federal income tax exemption on organizational salaries. This special status afforded by the Federal Government is, in our view, inconsistent with the University of Maryland's *discriminatory* denial of in-state status to G–4 aliens who are domiciled in the State.

[25] It is important to note that this case does not involve, and we express no views regarding, a State's imposition of a burden on all individuals sharing a common relevant characteristic, of whom only some are aliens.

sity made the representation to the District Court that in the event the 1976 order was "finally affirmed on appeal," it would make appropriate refunds. This representation was incorporated in the stay orders of both the District Court and Court of Appeals. It is petitioners' contention, however, that the 1976 order was "effectively" vacated when this Court, in *Toll* v. *Moreno*, 441 U. S. 458 (1979), vacated the judgment of the Court of Appeals and remanded the case to the District Court for reconsideration. Petitioners therefore conclude that the terms of the University's waiver of sovereign immunity can no longer be satisfied.

Petitioners' argument is not persuasive. We do not interpret *Toll* as having vacated the judgment of the District Court. In *Toll* the Court recognized that the University had altered its position through the promulgation of the clarifying resolution, raising "new issues of constitutional law which should be addressed in the first instance by the District Court." *Id.*, at 462. The Court declined, however, to decide whether the District Court, in issuing its 1976 order, had improperly relied on due process grounds, and whether continuation of the order was justified on equal protection or pre-emption grounds. Thus, while we vacated "the judgment of the Court of Appeals," *ibid.*, we left the judgment of the District Court undisturbed.[26] And contrary to petitioners' suggestion, a vacatur of the District Court's judgment was not necessary to give the District Court jurisdiction to reconsider the case. See *Goldberg* v. *United States*, 425

---

[26] Petitioners note, however, that whereas the District Court's 1976 order was based solely on due process grounds, the District Court, on remand, held the in-state policy as it operated during the period following the clarifying resolution invalid on two different grounds—equal protection and pre-emption. In our view, this fact is of little moment. Just as a respondent is entitled to defend in this Court a judgment on grounds different from those relied on by the court below, *e. g.*, *Colautti* v. *Franklin*, 439 U. S. 379, 397, n. 16 (1979), respondents in this case were entitled, following our remand, to support a reaffirmance of the earlier order on grounds previously urged but not relied on.

U. S. 94, 111–112 (1976); *Campbell* v. *United States*, 365 U. S. 85, 98–99 (1961); 28 U. S. C. §2106 ("The Supreme Court . . . may affirm, modify, vacate, set aside or reverse any judgment . . . and may . . . require such further proceedings to be had as may be just under the circumstances").[27]

## IV

For the foregoing reasons, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE BLACKMUN, concurring.

I join the Court's opinion. Its action today provides an eloquent and sufficient answer to JUSTICE REHNQUIST's dissent: despite the vehemence with which his opinion is written, JUSTICE REHNQUIST has persuaded only one Justice to his position. But because the dissent attempts to plumb the Court's psyche, see *post*, at 41–42, n. 12,[1] I feel compelled to add comments addressed to JUSTICE REHNQUIST's ruminations on equal protection. In particular, I cannot leave unchallenged his suggestion that the Court's decisions holding resident aliens to be a "suspect class" no longer are good law.

JUSTICE REHNQUIST's analysis on this point is based on a simple syllogism. Alienage classifications have been subjected to strict scrutiny, he suggests, because "aliens [are]

---

[27] Even if we were to assume that the judgment of the District Court was indeed vacated, we could not say that the terms of the University's waiver of sovereign immunity—that the District Court's order be "finally affirmed on appeal"—would not be satisfied. Petitioners have not prevailed on the merits in a single court, despite the numerous decisions that this litigation has prompted. By its original order, the District Court held that the University's in-state policy was invalid insofar as it discriminated against G–4 aliens. Today, we reaffirm that conclusion.

[1] The Justice opines that "[i]f the Court has eschewed strict scrutiny in the 'political process' [alienage-equal protection] cases, it may be because the Court is becoming uncomfortable with the categorization of aliens as a suspect class." *Post*, at 42, n. 12.

barred from asserting their interests in the governmental body responsible for imposing burdens upon them." *Post*, at 40. But "[m]ore recent decisions," he continues, have established that "the political powerlessness of aliens is itself the consequence of distinctions on the basis of alienage that are constitutionally permissible." *Ibid.* This prompts JUSTICE REHNQUIST to pose what one supposes to be a rhetorical question: "whether political powerlessness is any longer a legitimate reason for treating aliens as a 'suspect class' deserving of 'heightened judicial solicitude.'" *Post*, at 41. The reader would infer from this analysis that JUSTICE REHNQUIST would uphold state enactments disadvantaging aliens unless those enactments are wholly irrational.

With respect, in my view it is JUSTICE REHNQUIST's analysis that is wholly irrational; simply to state his proposition is to demonstrate its logical flaws. Most obviously, his exegesis of the Court's reasons for according aliens "suspect class" status is simplistic to the point of caricature. By labeling aliens a "'discrete and insular' minority," *Graham* v. *Richardson*, 403 U. S. 365, 372 (1971), the Court did something more than provide a historical description of their political standing. That label also reflected the Court's considered conclusion that for most legislative purposes there simply are no meaningful differences between resident aliens and citizens, see *Ambach* v. *Norwick*, 441 U. S. 68, 75 (1979), so that aliens and citizens are "persons similarly circumstanced" who must "be treated alike." *F. S. Royster Guano Co.* v. *Virginia*, 253 U. S. 412, 415 (1920). At the same time, both common experience and the unhappy history reflected in our cases, see *Cabell* v. *Chavez-Salido*, 454 U. S. 432, 462–463 (1982) (dissenting opinion); *Ambach* v. *Norwick*, 441 U. S., at 82 (dissenting opinion), demonstrate that aliens often have been the victims of irrational discrimination.

In combination, these factors—disparate treatment accorded a class of "similarly circumstanced" persons who historically have been disabled by the prejudice of the major-

ity—led the Court to conclude that alienage classifications "in themselves supply a reason to infer antipathy," *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S. 256, 272 (1979), and therefore demand close judicial scrutiny. This understanding, which is at the heart of the Court's modern alienage decisions, was unreservedly reaffirmed this Term in *Cabell* v. *Chavez-Salido*, 454 U. S., at 438 ("citizenship is not a relevant ground for the distribution of economic benefits").

JUSTICE REHNQUIST nevertheless suggests that the Court's original understanding somehow has been undercut by "more recent decisions" recognizing that aliens may be excluded from the governmental process. For this proposition he cites *Cabell* v. *Chavez-Salido, supra; Ambach* v. *Norwick, supra;* and *Foley* v. *Connelie*, 435 U. S. 291 (1978). Again, with all due respect, JUSTICE REHNQUIST is simply wrong. The idea that aliens may be denied political rights is not a recently discovered concept or a newly molded principle that can be said to have eroded the prior understanding. To the contrary, the Court always has recognized that aliens may be denied use of the mechanisms of self-government, and *all* of the alienage cases have been decided against the backdrop of that principle. Indeed, this aspect of the alienage-equal protection doctrine was explored at length in *Sugarman* v. *Dougall*, 413 U. S. 634, 647–649 (1973), the second of the Court's modern decisions in the area.[2] See *Cabell* v. *Chavez-Salido*, 454 U. S., at 438–442 (citing *Sugarman*); *Ambach* v.

---

[2] Among other things, the Court noted in *Sugarman* that the State may exclude aliens from governmental positions "that go to the heart of representative government," in an attempt " 'to preserve the basic conception of a political community.' " 413 U. S., at 647, quoting *Dunn* v. *Blumstein*, 405 U. S. 330, 344 (1972). The *Sugarman* Court thus recognized the "State's historical power to exclude aliens from participation in its democratic political institutions." 413 U. S., at 648. This makes JUSTICE REHNQUIST's analysis particularly perplexing; his discussion appears to suggest that *Sugarman*—decided in 1973—somehow undercut the analysis of *Hampton* v. *Mow Sun Wong*, 426 U. S. 88 (1976). See *post*, at 40.

*Norwick*, 441 U. S., at 74 (citing *Sugarman*); *Foley* v. *Connelie*, 435 U. S., at 294–296 (citing *Sugarman*). Yet in cases contemporary with or postdating *Sugarman* the Court has experienced no noticeable discomfort in applying strict scrutiny to alienage classifications that did not involve political interests. See *In re Griffiths*, 413 U. S. 717 (1973); *Examining Board* v. *Flores de Otero*, 426 U. S. 572 (1976); *Nyquist* v. *Mauclet*, 432 U. S. 1 (1977).

It is not surprising, then, that none of the "more recent decisions" relied on by JUSTICE REHNQUIST so much as suggested that the Court's earlier analysis had been undercut. Instead, those cases pointedly have *declined* to "retrea[t] from the position that restrictions on lawfully resident aliens that primarily affect economic interests are subject to heightened judicial scrutiny." *Cabell* v. *Chavez-Salido*, 454 U. S., at 439. See *Ambach* v. *Norwick*, 441 U. S., at 75 (that aliens may be denied political rights "is an exception to the general standard applicable to classifications based on alienage"); *Foley* v. *Connelie*, 435 U. S., at 296. This reflects the Court's proper judgment that the alienage cases are not irreconcilable or inconsistent with one another. For while the Court has recognized, as the Constitution suggests, that alienage may be taken into account when it is relevant—that is, when classifications bearing on political interests are involved—"[t]he distinction between citizens and aliens . . . ordinarily [is] *irrelevant* to private activity," *Ambach* v. *Norwick*, 441 U. S., at 75 (emphasis added). And it hardly need be demonstrated that governmental distinctions based on irrelevant characteristics cannot stand. If this dual aspect of alienage doctrine is unique, it is because aliens constitute a unique class.[3]

---

[3] JUSTICE REHNQUIST suggests that alienage classifications involving political interests are subjected to a lesser standard of review because "the strength of the State's interest is great when it seeks to exclude aliens from its political processes." *Post*, at 41, n. 12. This suggestion is inaccurate. Such classifications are permissible because the Court has rec-

Finally, even were I to accept JUSTICE REHNQUIST's view that powerlessness is the end-all of alienage-equal protection doctrine, I would find preposterous his further suggestion that, because States do not violate the Constitution when they exclude aliens from participation in the government of the community, the alien's powerlessness therefore is constitutionally irrelevant. From the moment the Court began constructing modern equal protection doctrine in *United States* v. *Carolene Products Co.*, 304 U. S. 144 (1938), it never has been suggested that the *reason* for a discrete class' political powerlessness is significant; instead, the *fact* of powerlessness is crucial, for in combination with prejudice it is the minority group's inability to assert its political interests that "curtail[s] the operation of those political processes ordinarily to be relied upon to protect minorities." *Id.*, at 152–153, n. 4. The very powerlessness of a discrete minority, then, is itself the factor that overcomes the usual presumption that "'even improvident decisions [affecting minorities] will eventually be rectified by the democratic process.'" *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S., at 272, quoting *Vance* v. *Bradley*, 440 U. S. 93, 97 (1979). If anything, the fact that aliens constitutionally may be—and generally are—formally and completely barred from participating in the process of self-government makes particularly profound the need for searching judicial review of classifications grounded on alienage. I might add that the Court explicitly has endorsed this seemingly self-evident proposition: in *Hampton* v. *Mow Sun Wong*, 426 U. S. 88 (1976), after noting that "[s]ome of [an alien's] disadvantages stem directly from the Constitution itself," the Court declared that "[t]he legitimacy of the delineation of the affected class [of aliens] buttresses the conclusion that it is 'a "discrete and insular" minority' . . . and, of course, is consistent with the premise that the class is one whose members suffer spe-

---

ognized that they are likely to be based on meaningful distinctions: alienage "is a relevant ground for determining membership in the political community." *Cabell* v. *Chavez-Salido*, 454 U. S. 432, 438 (1982).

cial disabilities." *Id.*, at 102, n. 22.    I find JUSTICE REHN-
QUIST's attempt to stand this principle on its head perplex-
ing, to say the least.

One of the few assertions that can be made with complete
confidence about the Court's alienage-equal protection deci-
sions is that no opinion for the Court has ever so much as sug-
gested that JUSTICE REHNQUIST's lone dissent in *Sugarman*,
413 U. S., at 649—which espoused a view similar to the one
he hints at today—expressed the proper approach for decid-
ing these cases.    Of course, one cannot condemn another for
sticking to his guns.    Barring a radical change in the Court's
reasoning in cases concerning alienage, however, one can ex-
pect that today's equal protection writing by JUSTICE REHN-
QUIST will join his opinion in *Sugarman*, to use his phrase, as
"lifeless words on the pages of these Reports."    *Post*, at 48.

JUSTICE O'CONNOR, concurring in part and dissenting in
part.

I concur in the Court's opinion insofar as it holds that the
State may not charge out-of-state tuition to nonimmigrant
aliens who, under federal law, are exempt from both state
and federal taxes, and who are domiciled in the State.    Im-
position of out-of-state tuition on such aliens conflicts with
federal law exempting them from state taxes, since, after all,
the University admits that it seeks to charge the higher tu-
ition in order to recover costs that state income taxes nor-
mally would cover.

I cannot join the remainder of the Court's opinion, how-
ever, for it wholly fails to address the criticisms leveled in
JUSTICE REHNQUIST's dissenting opinion.    As JUSTICE
REHNQUIST makes clear, the class of G–4 aliens is not homog-
enous: some G–4 aliens are exempt under federal law from
state taxes, while other G–4 aliens are not.    Moreover, the
legislative history of § 4(b) of the International Organizations
Immunities Act, later reenacted as § 893 of the Internal Rev-
enue Code of 1954, 26 U. S. C. § 893, from which many G–4

aliens derive their federal tax immunity, demonstrates that Congress did not intend to exempt such aliens from state taxes, choosing instead to leave the matter to the state and local authorities. Thus, I disagree with the Court when it states that the "State may not recoup indirectly from respondents' parents the taxes that the Federal Government has expressly barred the State from collecting," *ante*, at 16, for in fact Congress has not barred the State from collecting state taxes from many G–4 aliens. Accordingly, I conclude that the Supremacy Clause does not prohibit the University from charging out-of-state tuition to those G–4 aliens who are exempted by federal law from federal taxes only.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

Despite rather broad dicta regarding the conditions under which federal power over immigration will pre-empt state statutes that adversely affect aliens, the Court's holding is narrow. Purporting to rely on a collection of treaties and statutes that concern the *tax* liability of certain nonimmigrant aliens, it concludes that no room is left for the State of Maryland to charge such aliens nonresident *tuition* for attending the State's university. The Court's dicta seems to me inconsistent with our prior cases, and its conclusion about the effect of the statutes and treaties is strained at best. In short, the Court reaches a result that I find quite out of step with our normal approach to federal pre-emption of state law.

Its holding has the additional vice of foreclosing governmental autonomy in an area plainly within the State's traditional responsibilities—education. And it acts, not on behalf of a disadvantaged minority, but at the behest of a group of individuals who have been accorded a status by the Federal Government *superior* to that of the average citizen, and in a case where the State has demonstrated, by virtue of its favorable treatment of resident aliens, that its policy is not the result of an invidious or irrational motive. I find the Court's

actions unjustified and unnecessary and, accordingly, I dissent. Because I would reverse the judgment of the Court of Appeals, I also address other grounds relied on by the lower courts and argued by respondents in support of their judgments.

I

Our prior decisions indicate that "when a State's exercise of its police power is challenged under the Supremacy Clause, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)." *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 157 (1978). State laws will survive such a challenge unless there is "such actual conflict between the two schemes of regulation that both cannot stand in the same area, [or] evidence of a congressional design to preempt the field." *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 141 (1963).

Unquestionably, federal power over immigration and naturalization is plenary and exclusive. Our decision in *De Canas* v. *Bica*, 424 U. S. 351 (1976), however, unambiguously forecloses any argument that this power, either unexercised or as manifested in the Immigration and Nationality Act, preempts the field of regulations affecting aliens once federal authorities have admitted them into this country. In light of the Court's expansive observations in the instant case, that opinion bears quoting at some length:

"[T]he Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus *per se* pre-empted by [the Federal Government's] constitutional power, whether latent or exercised. For example, *Takahashi* v. *Fish & Game Comm'n*, 334 U. S. 410, 415–422 (1948), and *Graham* v. *Richardson*, 403 U. S. 365, 372–373 (1971), cited a line of

cases that upheld certain discriminatory state treatment of aliens lawfully within the United States. Although the 'doctrinal foundations' of the cited cases, which generally arose under the Equal Protection Clause 'were undermined in *Takahashi*,' they remain authority that, standing alone, the fact that aliens are the subject of a state statute *does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."* *Id.*, at 355 (citations omitted; emphasis added).

In *De Canas* the Court also held that Congress' enactment of the Immigration and Nationality Act (INA) was insufficient to oust "harmonious state regulation touching on aliens in general." *Id.*, at 358.

Thus, neither Congress' unexercised constitutional power over immigration and naturalization, nor its exercise of that power in passing the INA, precludes the States from enforcing laws and regulations that prove burdensome to aliens. Under our precedents, therefore, state law is invalid only if there is "such actual conflict between the two schemes of regulation that both cannot stand in the same area," *Florida Lime & Avocado Growers, Inc.* v. *Paul, supra,* at 141,[1] or if Congress has in some other way unambiguously declared its intention to foreclose the state law in question, see *Ray* v. *Atlantic Richfield Co., supra,* at 157–158. In the absence of a conflict, "we are not to conclude that Congress legislated the ouster of [a state law] in the absence of an unambiguous congressional mandate to that effect." *Florida Lime & Avocado Growers, supra,* at 146–147.

---

[1] The state courts in *De Canas* v. *Bica,* 424 U. S. 351 (1976), had not addressed the question in light of their determination that Congress had completely barred state action in the field of employment of illegal aliens. Consequently, this Court also deferred consideration of the issue. *Id.*, at 363.

Notwithstanding these settled principles, the Court suggests in dicta that any state law which discriminates against lawfully admitted aliens is void, presumably without regard to the strength of the State's justification, if Congress did not contemplate such a law. *Ante*, at 12–13. This standard seems to me clearly to reverse the presumption that normally prevails when state laws are challenged under the Supremacy Clause. The Court relies on language in three cases to support this proposition. On closer inspection, none of the three offers the precedential support for which the Court obviously grasps.

The first case, *Takahashi* v. *Fish & Game Comm'n*, 334 U. S. 410 (1948), involved a California statute that prohibited the issuance of commercial fishing licenses to aliens who were ineligible for citizenship. The language emphasized by the Court explains that "[s]tate laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid." *Id.*, at 419 (footnote omitted). In the *Takahashi* opinion, this statement is immediately followed by three citations, which the Court omits. These citations explain, and qualify, the otherwise broad language quoted by the Court. In the first of these cases, *Chy Lung* v. *Freeman*, 92 U. S. 275 (1876), the Court considered a California law that, with certain extremely limited exceptions, prohibited any alien who was, or would likely become, "a public charge," from entering the State through any of its ports. The Court held that the statute was pre-empted by federal law: "The passage of laws which concern the *admission* of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States." *Id.*, at 280 (emphasis added).

The second case cited in *Takahashi*, *Truax* v. *Raich*, 239 U. S. 33 (1915), concerned an Arizona statute limiting virtually all employment opportunities in the State to citizens. Although *Truax* involved an asserted repugnancy to the

Equal Protection Clause, the Court also suggested that the challenged statute was in conflict with federal law. It is important to note that the Court interpreted the statute as "deny[ing] to lawful inhabitants, because of their race or nationality, the ordinary means of earning a livelihood." *Id.*, at 41. The Court subsequently stated: "The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the State would be tantamount to the assertion of the right to deny them *entrance and abode,* for in ordinary cases they cannot live where they cannot work." *Id.*, at 42 (emphasis added).

The final case relied on in *Takahashi* is *Hines* v. *Davidowitz,* 312 U. S. 52 (1941). The Pennsylvania statute at issue there required adult aliens to register with the State and to carry an identification card, which they were required to present on demand to state agents. The Court held that the statute was pre-empted by the federal Alien Registration Act of 1940, finding that "[t]he basic subject of the state and federal laws [was] identical," *id.*, at 61, and that the state law embodied requirements that Congress had studiously avoided in passing the federal Act, *id.*, at 70–74.

Thus, in each of these cases, the Court found either a clear encroachment on exclusive federal power to admit aliens into the country or a clear conflict with a specific congressional purpose. It was with these cases in mind that the Court in *Takahashi* condemned "[s]tate laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States." 334 U. S., at 419. It is most unlikely, therefore, that the Court intended with one stroke of the pen to reverse the normal presumption applicable in cases challenging state enactments under the Supremacy Clause, and to declare such laws invalid without regard to the existence of a conflict with federal statutes or a usurpation of federal power over immigration.

The Court also relies on *Graham* v. *Richardson,* 403 U. S. 365 (1971), which struck down as a denial of equal protection a California law that withheld welfare benefits from lawfully

resident aliens. As an alternative ground, the Court also declared the law invalid as an encroachment on federal power. On the basis of specific federal statutes barring the admission of aliens likely to become public charges, and providing for the deportation of aliens who become public charges because of factors that existed prior to entry, the Court inferred a congressional purpose not "to impose any burden or restriction on aliens who become indigent after their entry into the United States." *Id.*, at 377. The Court also concluded, relying on *Truax, supra,* that the law denied indigent aliens the "necessities of life," and therefore "equate[d] with the assertion of a right, inconsistent with federal policy, to deny entrance and abode." The holding in *Graham,* therefore, offers no support for a presumption that *all* state laws burdening aliens conflict with amorphous federal power over immigration.

Finally, the Court quotes from dictum appearing in a footnote in *De Canas* v. *Bica,* 424 U. S., at 358, n. 6, that "'state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress.'" *Ante,* at 12–13. The principal support for this assertion was the passage previously quoted by the Court from *Takahashi.* As I have already indicated, that passage in context means a good deal less than it does out of context. Most important, however, *De Canas* itself suggests that the quoted footnote is not a fair description of the law. Although the statute at issue only affected illegal aliens, the principles recognized in the Court's opinion were not so limited. Thus, the Court emphasized that "the fact that aliens are the subject of a state statute does not render it a regulation of immigration," 424 U. S., at 355, that *Takahashi, Graham,* and *Hines* found pre-emption only after examining specific congressional enactments, 424 U. S., at 355, that it was necessary to look for some "specific indication . . . that Congress intended to preclude even harmonious state regulation touching on aliens in general," *id.*, at 358, and that pre-

emption should be found only when it is possible to say "'either that the nature of the regulated subject matter permits no other conclusion or that the Congress has unmistakably so ordained,'" *id.*, at 356 (quoting *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S., at 142).

In sum, the fact that a state statute can be said to discriminate against aliens does not, standing alone, demonstrate that the statute is pre-empted, absent some form of congressional sanction. The statute in *De Canas* discriminated against aliens, yet the Court found no strong evidence that Congress intended to pre-empt it. Obviously, the fact that the aliens were in this country illegally was an important factor in ascertaining Congress' intent. But, just as clearly, the fact that disadvantaged aliens are *lawfully* in the country does not authorize the Court to dispense with the particularized inquiry into congressional intent that pre-emption analysis traditionally has demanded.[2] Discriminatory legislation may well be invalid under the federal civil rights laws as a denial of equal treatment, but under our precedents such a conclusion is possible only after an examination of the classification drawn by the State and its justification for doing so. Under the Court's summary of pre-emption principles applicable to laws discriminating against aliens, these factors would be irrelevant.[3] I cannot agree that such a summary accurately reflects the law.

---

[2] As the Court obligatorily notes, *ante,* at 12, n. 17, but promptly ignores, our decisions in *Foley* v. *Connelie,* 435 U. S. 291 (1978); *Ambach* v. *Norwick,* 441 U. S. 68 (1979); and *Cabell* v. *Chavez-Salido,* 454 U. S. 432 (1982), all upheld state laws that expressly discriminated against lawfully admitted resident aliens. Such decisions would not have been possible if the mere fact that a law discriminated against aliens placed it in irreconcilable conflict with federal power over immigration.

[3] As I have always understood the Supremacy Clause, if a state law is inconsistent with federal law, the state law is unenforceable. The inconsistency is made no less fatal because the State has a rational basis for, or a compelling interest in, its actions. Under the majority's formulation, a state law that arguably discriminates against aliens conflicts with federal

The Court concedes that the proper application of its preemption principle "is likely to be a matter of some dispute," *ante*, at 13, and then proceeds to resolve the case by finding a conflict between Maryland's tuition policy and a collection of treaties and statutes that address the tax liability of certain nonimmigrant aliens. Although I find this conclusion quite unconvincing, it is gratifying to learn that in practice perhaps the Court's new principle still demands proof of a conflict with federal law, just as traditional pre-emption cases instruct. Because the Court's judgment relies on the asserted presence of such a conflict, its statements suggesting that such a particularized inquiry is unnecessary must be regarded as dicta, though unwise dicta at that. With this said, I turn to the Court's discovery of a conflict with federal law.

## II

The Court relies on two features of federal law. First, it notes that Congress has permitted nonimmigrant aliens holding G–4 visas to establish domicile in the United States. *Ante*, at 14. It then reasons that denying these aliens in-state tuition conflicts with Congress' decision. The Court offers no evidence that Congress' intent in permitting respondents to establish "domicile in the United States" has any bearing at all on the tuition available to them at state universities. Federal law does not require the States to make residence or domicile the determinant of their tuition policies, and as the Court recognizes, Maryland has chosen not to do so in the case of nonimmigrant aliens. Moreover, unlike the state laws scrutinized in *Truax* and *Graham*, Maryland's policy does not deprive respondents of a livelihood or the means of subsistence such that it could fairly be characterized as denying respondents "entrance and abode," 239 U. S., at 42.

---

law, and unless further modifications of the pre-emption doctrine are in the offing, that will be the end of the matter.

The Court's reference to "domicile in the United States," therefore, is little more than a restatement of its more general principle that any laws burdensome to aliens who have been lawfully admitted are presumptively pre-empted absent congressional intent to "sanction" them. As I have already suggested, this turns pre-emption analysis on its head.

The second feature of federal law on which the Court relies consists of certain statutes and treaties that affect the tax liability of G–4 visaholders. The Court considers these statutes and treaties as an amorphous whole and concludes that the University's policy "frustrates" the policies embodied in them. "The State may not recoup indirectly from respondents' parents the taxes that the Federal Government has expressly barred the State from collecting." *Ante*, at 16. There are two serious flaws in this argument. First, the Federal Government has not barred the States from collecting taxes from many, if not most, G–4 visaholders. Second, as to those G–4 nonimmigrants who *are* immune from state income taxes by treaty, Maryland's tuition policy cannot fairly be said to conflict with those treaties in a manner requiring its pre-emption.

The individual respondents in this case represent a class of G–4 visaholders or their dependents who are or may become students at the University of Maryland. The Court, contrary to the teaching of our cases,[4] reasons as though the class members were a homogenous group. They are not, and the Court's ignorance of relevant differences leads it into error. The named class representatives are dependents of employees of either the Inter-American Development Bank or the International Bank for Reconstruction and Develop-

---

[4] "[A] host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other; and the class of aliens is itself a heterogenous multitude of persons with a wide-ranging variety of ties to this country." *Mathews* v. *Diaz,* 426 U. S. 67, 78–79 (1976) (footnote omitted).

ment (the World Bank). As the Court notes, the salaries paid employees of these organizations are exempt by international agreement from taxation by any country other than their own. *Ante*, at 15. As the Court also notes, the exemption contained in the agreement establishing the World Bank has by statute been given the force of federal law in the United States. 22 U. S. C. § 286h; see *ante*, at 15–16.

Most G–4 visaholders, however, derive whatever tax immunity they enjoy in this country from § 4(b) of the International Organizations Immunities Act (IOIA or Act), later reenacted as § 893 of the Internal Revenue Code of 1954, 26 U. S. C. § 893. That statute exempts the salaries paid to alien employees of international organizations from *federal* income tax. The principal purpose of the Act as a whole, which is now divided among many Titles of the United States Code, was to extend governmental privileges and immunities to international organizations and their officers and employees located in this country. H. R. Rep. No. 1203, 79th Cong., 1st Sess., 4 (1945). As noted, § 4 amended the Internal Revenue Code to exempt the salaries of such officers and employees from federal income tax. As the relevant Committee Reports demonstrate, the exemption was strictly limited to salaries; income derived from commercial activities, investments, and other similar sources was not to enjoy an exemption, and all federal taxes other than those applicable to income remained fully effective. *Ibid.;* S. Rep. No. 861, 79th Cong., 1st Sess., 4–5 (1945).

Section 6 of the bill, as originally introduced in the House, provided an exemption from state and local taxes as well.[5]

---

[5] Section 6 of the original bill, H. R. 4489, read as follows:

"International organizations shall be exempt from all property taxes imposed by, or under the authority of, any act of Congress, including such acts as are applicable solely to the District of Columbia or the Territories; and shall be entitled to the same exemptions and immunities from State or local taxes as is the United States Government." 91 Cong. Rec. 10867 (1945).

The Senate Committee deleted the exemption, reasoning that "this matter should be properly dealt with by the State and local authorities." S. Rep. No. 861, *supra*, at 5. The House eventually agreed to the amendment, and the bill as enacted contains no exemption from state or local taxes.[6] Floor debates confirm what the Committee amendment implied: although the Act provides an exemption from the federal income tax, it was not intended to foreclose the States from taxing employees of international organizations.[7] Accordingly, employees of international organizations whose tax immunity derives solely from the IOIA can claim no federal immunity from state taxes. According to petitioners, approximately three-quarters of the international organizations whose employees hold G–4 visas fall into that category. Brief for Petitioners 29, n. 22. Therefore, even if one were to accept the Court's reasoning that immunity from state taxes implies a right to in-state college tuition, many, if not most of the class members cannot benefit from the argument.[8]

---

[6] Section 6 is codified at 22 U. S. C. § 288c and now reads:

"International organizations shall be exempt from all property taxes imposed by, or under the authority of, any Act of Congress, including such Acts as are applicable solely to the District of Columbia or the Territories."

[7] Thus, sponsors of the legislation in the House assured their colleagues that the bill would not admit such employees as immigrants. In addition, the following exchange occurred:

"Mr. RANKIN. This bill does not interfere with State laws in any way?

"Mr. ROBERTSON of Virginia. None whatever." 91 Cong. Rec. 10866 (1945).

In the Senate, Senator Taft explained that his Committee had deleted the proposed exemption contained in § 6 because it "felt that that was wholly beyond the power of Congress." 91 Cong. Rec. 12432 (1945).

[8] G–4 visaholders residing in Maryland who are relieved of federal taxes under the Internal Revenue Code have also been exempted from Maryland taxes by operation of *state* law. Maryland's tax code provides that, with certain exceptions not relevant here, the net income taxable under state law is the taxpayer's federal adjusted gross income. Md. Ann. Code, Art. 81, § 280(a) (1980). By operation of 26 U. S. C. § 893, that amount will not

The Court's reasoning is flawed, however, and cannot help even those class members whose parents' tax immunity is based on a treaty or international agreement.[9] The State's tuition policy is void under the Supremacy Clause only "to the extent that it actually conflicts with a valid federal statute," *Ray* v. *Atlantic Richfield Co.*, 435 U. S., at 158, or, of course, a valid treaty. As the Court stated in *Ray, ibid.:*

> "A conflict will be found 'where compliance with both federal and state regulations is a physical impossibility . . . ,' *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or where the state 'law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941); *Jones* v. *Rath Packing Co.*, [430 U. S.], at 526, 540–541. Accord, *De Canas* v. *Bica*, 424 U. S. 351, 363 (1976)."

There is, of course, no physical impossibility in the coexistence of the two policies. The treaties and agreements insure that signatory nations will not tax the salaries of foreign

---

include wages paid by an international organization. The *State's* decision indirectly to relieve class members of state taxes on their salaries of course provides no basis for pre-emption of the State's tuition policy under the Supremacy Clause.

[9] The District Court, which concluded that the State's tuition policy interfered with Congress' exclusive control over immigration, nevertheless rejected the argument that the policy conflicted with the treaties and agreements relieving respondents of liability for income taxes.

"In this case it is apparent that there is no 'clear conflict' between the policies in question. The University's Policy seeks to confer certain economic benefits on individuals closely affiliated with the State of Maryland. The mere fact that one of the factors which is considered in determining eligibility for this benefit is whether or not the applicant's income is taxed by Maryland does not necessarily imply that the policy conflicts with the tax policies contained in the relevant international agreements. The 'conflict' between these policies, in and of itself, is too attenuated to warrant invalidating the University's Policy." 489 F. Supp. 658, 667 (Md. 1980).

nationals employed by the designated organizations. The State of Maryland does not tax these salaries. It merely charges tuition for enrollment in its University that is higher than the tuition charged to American citizens and other foreign nationals who have been admitted to this country as immigrants.

The remaining question is whether Maryland's tuition policy "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of the treaties and agreements. *Hines* v. *Davidowitz*, 312 U. S., at 67. In answering this question, it is well to bear in mind certain guideposts that the Court appears to have forgotten: "It is, of course, true that even treaties with foreign nations will be carefully construed so as not to derogate from the authority and jurisdiction of the States of this nation unless clearly necessary to effectuate the national policy." *United States* v. *Pink*, 315 U. S. 203, 230 (1942). "Even the language of a treaty wherever reasonably possible will be construed so as not to override state laws or to impair rights arising under them." *Guaranty Trust Co.* v. *United States*, 304 U. S. 126, 143 (1938). In this case, the Court has gone out of its way to raise the banner of federal supremacy over the State's University, without support in the language of the treaties and without examining the intent of the negotiating parties.

It is one thing to exempt employees of an international organization from tax liability on their salaries, which otherwise would be incurred by the employees simply by doing what they came to this country to do—working for international organizations such as the World Bank. It is another matter to restrict the State's ability to recover its costs in providing educational services, which respondents were certainly not required to use. Cf. *Hamilton* v. *Regents of the University of California*, 293 U. S. 245, 262 (1934). Although a college education over the years has become accessible to increasing numbers of Americans, it can hardly be characterized as an unavoidable feature of life in this country.

Thus, although the negotiating parties undoubtedly intended to lower the costs of international organizations by exempting employees from income taxes, it does not at all follow that they *further* intended to require the States to subsidize the cost of services which those employees or their families might choose to use.[10]

Indeed, the United States, which unlike the State of Maryland negotiated the agreements in question, clearly does not understand them to require that education for G–4 visaholders be subsidized to the same extent as education for citizens or resident aliens. For example, the Federal Guaranteed Student Loan Program, which provides significant aid to students attending qualifying colleges and graduate schools, is available to American citizens and permanent resident aliens, but *not* to nonimmigrant aliens such as respondents. See 34 CFR § 682.201(a)(2) (1981). If this reflects the federal policy embodied in the treaties on which the Court relies, I fail to see how Maryland's tuition policy "frustrates" it.

### III

The lower courts' principal basis for invalidating Maryland's tuition policy was not the Supremacy Clause, but the Equal Protection Clause. Those courts interpreted the State's policy as a classification based on alienage, and there-

---

[10] As petitioners explain, tuition and fee charges do not pay the full cost of a university education at the University of Maryland. In fiscal year 1981, for example, the University received appropriations from general fund revenues in the amount of $164 million. Brief for Petitioners 29, n. 23. Nearly half of general fund revenues are provided by the State's income tax. *Ibid.* The State, therefore, subsidizes the cost of education at the University. The amount of the subsidy, of course, is considerably greater for students who are eligible for in-state tuition. Since residents of the State normally pay income tax, and thereby indirectly contribute to the subsidy, it is not unreasonable for the State to accord such persons a reduced tuition. By charging respondents out-of-state tuition, the University is merely asking them to pay their fair share of the cost of state-supported education.

fore subjected it to "strict scrutiny" on the authority of *Graham* v. *Richardson*, 403 U. S. 365 (1971), and later cases. In light of several recent decisions, however, it is clear that not every alienage classification is subject to strict scrutiny. In my view, the classification relied upon by the State in this case cannot fairly be called "suspect," and therefore I would ask only whether it rests upon a rational basis. Because I believe it does, I cannot agree with the lower courts that it denies the equal protection of the laws.

The Equal Protection Clause of the Fourteenth Amendment has been interpreted by this Court as embodying the principle that "all persons similarly circumstanced shall be treated alike." *F. S. Royster Guano Co.* v. *Virginia*, 253 U. S. 412, 415 (1920). By the same token, however, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner* v. *Texas*, 310 U. S. 141, 147 (1940).

All laws classify, and, unremarkably, the characteristics that distinguish the classes so created have been judged relevant by the legislators responsible for the enactment. The Equal Protection Clause, however, reflects the judgment of its Framers that some distinguishing characteristics may seldom, if ever, be the basis for difference in treatment by the legislature. The key question in all equal protection cases, of course, is whether the distinguishing characteristics on which the State relies are constitutional.

In the vast majority of cases our judicial function permits us to ask only whether the judgment of relevance made by the State is rational. See *McGowan* v. *Maryland*, 366 U. S. 420, 425–426 (1961).[11] In a very few other cases, we have required that the State pass a more demanding test because of

---

[11] "This standard reduces to a minimum the likelihood that the federal judiciary will judge state policies in terms of the individual notions and predilections of its own members, and until recently it has been followed in all kinds of 'equal protection' cases." *Harper* v. *Virginia Board of Elections*, 383 U. S. 663, 681–682 (1966) (Harlan, J., dissenting).

the judgment that the classification drawn by the State is virtually never permissible from a constitutional perspective. Such classifications are deemed "suspect" and strictly scrutinized.   Until 1971, only race and national origin had been so classified by the Court.   See *Brown* v. *Board of Education,* 347 U. S. 483, 494 (1954); *Strauder* v. *West Virginia,* 100 U. S. 303 (1880); *Oyama* v. *California,* 332 U. S. 633 (1948).

In *Graham* v. *Richardson, supra,* the Court added alienage to this select list.   Apart from the abbreviated conclusion that "[a]liens as a class are a prime example of a 'discrete and insular' minority," *id.,* at 372, the Court did not elaborate on the justification for "heightened judicial solicitude," *ibid.* Subsequently, the Court observed that aliens, unlike other members of the community, were subject to the particular disadvantage of being unable to vote, and thus were barred from participating formally in the process of self-government.   *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 102 (1976).   One could infer that rigorous judicial scrutiny normally was necessary because aliens were barred from asserting their interests in the governmental body responsible for imposing burdens upon them.

More recent decisions have established, however, that the political powerlessness of aliens is itself the consequence of distinctions on the basis of alienage that are constitutionally permissible.

"[I]t is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions.   See [*Sugarman* v. *Dougall,* 413 U. S. 634, 647–649 (1973)].   Similar considerations support a legislative determination to exclude aliens from jury service.   See *Perkins* v. *Smith,* 370 F. Supp. 134 (Md. 1974), aff'd, 426 U. S. 913 (1976). Likewise, we have recognized that citizenship may be a relevant qualification for fulfilling those 'important non-elective executive, legislative, and judicial positions,' held by 'officers who participate directly in the formu-

lation, execution, or review of broad public policy.' *Dougall, supra*, at 647." *Foley* v. *Connelie*, 435 U. S. 291, 296 (1978).

As the Court explained earlier this Term:

"The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition. Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community. Judicial incursions into this area may interfere with those aspects of democratic self-government that are most essential to it." *Cabell* v. *Chavez-Salido*, 454 U. S. 432, 439–440 (1982).

If the exclusion of aliens from the political processes is legitimate, as it clearly is, there is reason to doubt whether political powerlessness is any longer a legitimate reason for treating aliens as a "suspect class" deserving of "heightened judicial solicitude." Indeed, in *Foley* v. *Connelie, supra, Ambach* v. *Norwick,* 441 U. S. 68 (1979), and *Cabell* v. *Chavez-Salido, supra,* the Court plainly eschewed the application of strict scrutiny to the States' exclusion of aliens from particular public offices.[12] In my view, these decisions merely

---

[12] As suggested earlier, we have affirmed "the general principle that some state functions are so bound up with the operation of the State as a governmental entity as to permit the exclusion from those functions of all persons who have not become part of the process of self-government." *Ambach* v. *Norwick,* 441 U. S., at 73–74. "[I]n those areas the State's exclusion of aliens need not 'clear the high hurdle of "strict scrutiny," because [that] would "obliterate all the distinctions between citizens and aliens, and thus depreciate the historic value of citizenship."' *Foley* v. *Connelie,* 435 U. S., at 295 (citation omitted)." *Cabell* v. *Chavez-Salido,* 454 U. S., at 439 (footnote omitted). The Court has recognized that the strength of the State's interest is great when it seeks to exclude aliens from its political processes, but selection of the appropriate level of "scrutiny" traditionally

reflect the judgment that alienage, or the other side of the coin, citizenship, is for certain important state purposes a constitutionally relevant characteristic and therefore cannot always be considered invidious in the same manner as race or national origin.[13]

---

has depended, not on the nature of the State's interest, but on the nature of the burdened class.   If the Court has eschewed strict scrutiny in the "political process" cases, it may be because the Court is becoming uncomfortable with the categorization of aliens as a suspect class.

[13] That judgment was shared by the Framers of the Fourteenth Amendment.   Indeed, the first clause of the first section of that Amendment confirms the importance of citizenship by defining the means of obtaining it in a way that encompassed the freed slaves: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside."   Citizenship is also a concept fundamental to structures and processes established elsewhere in the Constitution:

"The distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a State.   The Constitution itself refers to the distinction no less than 11 times, see *Sugarman* v. *Dougall, supra,* at 651–652 (REHNQUIST, J., dissenting), indicating that the status of citizenship was meant to have significance in the structure of our government.   The assumption of that status, whether by birth or naturalization, denotes an association with the polity which, in a democratic republic, exercises the powers of governance." *Ambach* v. *Norwick, supra,* at 75.

JUSTICE BLACKMUN has chosen to respond to this portion of the dissent, but misunderstands my point.   I have observed that the political powerlessness of aliens is the result of state-created classifications which this Court has upheld as constitutional.   One may nevertheless conclude, as JUSTICE BLACKMUN does, that the political powerlessness of aliens is still a reason for applying strict scrutiny to alienage classifications.   My point, to which JUSTICE BLACKMUN's concurrence is unresponsive, is that a classification which is constitutionally relevant to many important state purposes should not be considered "suspect."   It is beside the point to recognize that alienage may be irrelevant for some other purposes.   Were this consideration conclusive, all state classifications would be considered "suspect" under the Equal Protection Clause because every classification is relevant to some purposes and irrelevant to others.

## IV

The State's policy in this case is to provide in-state tuition to residents of the State who are citizens and immigrant aliens lawfully admitted for permanent residence. In-state tuition is not available to certain students, however, regardless of whether they have established residence within the State. Within this class are citizens who are financially dependent either on parents or on a spouse who is not domiciled in the State, as well as citizens who are members of the Armed Forces and have been assigned by the military to attend the University.[14] Also within the class are nonimmigrant aliens, who have not been admitted to this country for permanent residence.

---

[14] The State's written policy, effective since 1975, reads in part as follows:

"1. It is the policy of the University of Maryland to grant in-state status for admission, tuition and charge-differential purposes to United States citizens, and to immigrant aliens lawfully admitted for permanent residence in accordance with the laws of the United States, in the following cases:

"a. Where a student is financially dependent upon a parent, parents, or spouse domiciled in Maryland for at least six consecutive months prior to the last day available for registration for the forthcoming semester.

"b. Where a student is financially independent for at least the preceding twelve months, and provided the student has maintained his domicile in Maryland for at least six consecutive months immediately prior to the last day available for registration for the forthcoming semester.

"c. Where a student is the spouse or a dependent child of a full-time employee of the University.

"d. Where a student who is a member of the Armed Forces of the United States is stationed on active duty in Maryland for at least six consecutive months immediately prior to the last day available for registration for the forthcoming semester, unless such student has been assigned for educational purposes to attend the University of Maryland.

"e. Where a student is a full-time employee of the University of Maryland.

"2. It is the policy of the University of Maryland to attribute out-of-state status for admission, tuition, and charge-differential purposes in all other cases." App. to Pet. for Cert. 167a–168a.

In each case in which the Court has tested state alienage classifications under the Equal Protection Clause, the question has been the extent to which the States could permissibly distinguish between citizens and permanent resident aliens. See *Graham* v. *Richardson*, 403 U. S. 365 (1971); *Sugarman* v. *Dougall*, 413 U. S. 634 (1973); *In re Griffiths*, 413 U. S. 717 (1973); *Examining Board* v. *Flores de Otero*, 426 U. S. 572 (1976); *Nyquist* v. *Mauclet*, 432 U. S. 1 (1977). We recently summarized these decisions as implying that "there would be few—if any—areas in which a State could legitimately distinguish between its citizens and *lawfully resident aliens*." *Cabell* v. *Chavez-Salido*, 454 U. S., at 438 (emphasis added). In this case, however, the question is whether the State can distinguish between two groups, each of which consists of citizens and aliens. For two reasons, the State's classification should not be deemed "suspect" and subjected to strict scrutiny.

First, unlike immigrant aliens, nonimmigrants such as G–4 visaholders are significantly different from citizens in certain important respects. Our previous decisions have emphasized that immigrant aliens have been lawfully admitted to this country for permanent residence and share many of the normal burdens of citizenship, such as the duty to pay taxes and to serve in the Armed Forces. *Nyquist* v. *Mauclet*, *supra*, at 12; *Hampton* v. *Mow Sun Wong*, 426 U. S., at 107, n. 30; *Sugarman* v. *Dougall*, *supra*, at 645; *Graham* v. *Richardson*, *supra*, at 376. Implicit in these cases is the judgment that because permanent resident aliens are in so many respects situated similarly to citizens, distinctions between them are to be carefully scrutinized.[15] Although there is le-

---

[15] For example, in *Nyquist*, the Court stated:

"Resident aliens are obligated to pay their full share of the taxes that support the assistance programs. There thus is no real unfairness in allowing resident aliens an equal right to participate in programs to which they contribute on an equal basis." 432 U. S., at 12.

gitimate doubt whether these decisions have survived *Foley*, *Ambach*, and *Cabell* intact, their judgment about the need for strict scrutiny simply does not apply to state policies that distinguish between permanent resident aliens and nonimmigrants.

As noted earlier, nonimmigrant aliens holding G–4 visas, unlike resident aliens, are exempt from Maryland's income tax, by operation of either international agreement or a combination of federal and state law.[16]   The University is substantially supported by general state revenues appropriated by the legislature, and of this sum nearly half is generated by the state income tax.   See Brief for Petitioners 29, n. 23. Consequently, for the purpose of assessing tuition to the State's University, G–4 nonimmigrant aliens are not situated similarly either to most citizens or to permanent resident aliens.   They are distinguished by a trait that is obviously quite relevant from the State's perspective, and legitimately so.   Other nonimmigrant aliens are subject to state income taxes, but, as respondents concede, Brief for Respondents 12, 14, 23, they are admitted to this country only temporarily and for limited purposes.   These aliens are also not situated similarly to resident citizens or to permanent resident aliens because most are admitted on the condition that they cannot establish domicile in the United States.   See *Elkins* v. *Moreno*, 435 U. S. 647, 665 (1978).   As a group, then, nonimmigrant aliens are sufficiently different from citizens in relevant respects that distinctions between them and citizens or immigrant aliens should not call for heightened scrutiny.

Second, the State's tuition policy, as it applies to G–4 visaholders, simply cannot be broadly characterized as a classification that discriminates on the basis of alienage.   It is more accurately described as a policy that classifies on the basis of

---

[16] In addition, nonimmigrant aliens are not required to register for military service.   See 50 U. S. C. App. § 453(a) (1976 ed., Supp. V); 32 CFR § 1611.2 (1980).

financial contribution toward the costs of operating the University. In one class are citizens and permanent resident aliens, all of whom have lived in the State and have contributed to state revenues through the payment of income taxes. To these students the State offers its in-state tuition, which covers only a portion of the cost of educating each student. The remainder is subsidized through state revenues, to which the students themselves have contributed by paying the full spectrum of state taxes.

In the other class is an equally mixed group of citizens and aliens. Some of these citizens do not reside in the State and therefore do not pay state taxes. Others do reside in the State, but are financially dependent on parents or a spouse who is domiciled elsewhere and therefore do not help finance the operation of the University through income taxes. Nonimmigrant aliens holding G–4 visas also reside in the State but, like citizens in this class, do not pay state income taxes.[17] To all members of this class the State charges a higher, so-called "out-of-state" tuition, although one that still does not fully cover the cost of education. Just as it may seem unfair for a State to deny to a resident alien the right to participate in public benefits to which he has contributed through taxes, it might seem equally unfair to allow G–4 visaholders to participate, on a par with taxpaying resident citizens and permanent resident aliens, in public benefits to which they have *not* contributed. Whether or not such a judgment is correct, a policy justified in such terms cannot fairly be called the product of xenophobic prejudice. Given the State's decision to treat immigrant aliens on a par with citizens, its decision to require a higher tuition of G–4 nonimmigrant aliens cannot

---

[17] Other nonresident aliens whose tax liability is not the subject of a treaty or special law such as the IOIA are subject to taxation only on income received from sources within the United States at a maximum rate of 30%. 26 U. S. C. § 871(a)(1).

be characterized as a classification on the basis of alienage.[18]

Consequently, for either of these reasons, the "strict scrutiny" authorized by *Graham* v. *Richardson,* 403 U. S. 365 (1971), even if it is still applicable to discrimination against permanent resident aliens, has no proper application to the State's policy in this case. The only question, therefore, is whether "the State's classification rationally furthers the purpose identified by the State." *Massachusetts Board of Retirement* v. *Murgia,* 427 U. S. 307, 314 (1976). The State has articulated several purposes for its policy of denying in-state tuition to nonimmigrant aliens. One purpose is roughly to equalize the cost of higher education borne by those students who do and those who do not financially contribute to the University through income tax payments. The purpose surely is a legitimate one, and I should think it evident that the State's classification rationally furthers that purpose.[19]

---

[18] Respondents, citing *Nyquist* v. *Mauclet,* 432 U. S., at 9, argue that strict scrutiny applies even when the State discriminates only against a certain subclass of aliens rather than all aliens. In *Nyquist,* the State argued that its law limiting financial assistance for higher education to citizens and resident aliens who declared their intention to seek citizenship was not a classification on the basis of alienage. Rather, it distinguished between aliens who intended to become citizens and those who did not. The Court rejected this argument, noting that the statute was "directed at aliens and that only aliens [were] harmed by it." *Ibid.* In this case, however, the State also denies in-state tuition to certain resident citizens, as well as to G–4 visaholders. Moreover, even if the State denied in-state tuition to G–4 visaholders alone, strict scrutiny would not be called for. As argued in the text, G–4 visaholders and other nonimmigrant aliens, unlike permanent resident aliens who were the subject of discrimination in *Nyquist,* are not so similarly situated to citizens as to render distinctions between such aliens and citizens "suspect."

[19] As respondents note, G–4 visaholders do pay state taxes other than the income tax. State and local property taxes, however, do not enter the general funds of the State and thus do not support the operation of the University. Brief for Petitioners 29, n. 23. In any event, "a State does not

## V

On June 23, 1978, approximately two months after our decision in *Elkins* v. *Moreno*, 435 U. S. 647 (1978), the University's Board of Regents adopted a "clarifying" resolution establishing beyond doubt that the State's policy excluding G–4 visaholders from eligibility for in-state tuition was not based on their lack of domicile. For this reason, we remanded the case to the District Court for further proceedings, having concluded that this case was no longer controlled by *Vlandis* v. *Kline,* 412 U. S. 441 (1973), as limited by *Weinberger* v. *Salfi,* 422 U. S. 749, 771 (1975). *Toll* v. *Moreno,* 441 U. S. 458, 461–462 (1979). On remand, the District Court concluded that although the clarifying resolution adopted on June 23, 1978, eliminated the "conclusive presumption" that respondents could not establish domicile, the existence of such a presumption before that date denied respondents due process under the teaching of *Vlandis* v. *Kline, supra.*

There is legitimate doubt whether at this late date anything remains of *Vlandis* v. *Kline* but its lifeless words on the pages of these Reports. Such doubts, however, need not be resolved in this case. The University has made clear that domicile is not the principal consideration underlying its tuition policy as applied to respondents, and in my view that policy is rationally related to other legitimate purposes proffered by the State. The classification challenged by respondents did not change on June 23, 1978. If the classification is valid today, as I believe it is, then it was valid before the State issued its "clarifying" resolution. A statute's con-

---

violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." *Dandridge* v. *Williams,* 397 U. S. 471, 485 (1970). Respondents' exemption from the income tax sufficiently distinguishes them from citizens and other aliens who do pay such taxes, and therefore contribute a greater portion of their incomes to support the University, that the State's decision to require higher tuition payments is certainly rational.

sistency with the Due Process Clause or the Equal Protection Clause should not depend on which purpose state officials choose to emphasize at a particular time, as long as one of the State's purposes is rationally served by the statute. See *McGowan* v. *Maryland*, 366 U. S., at 426 ("A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it").

For the foregoing reasons, I would reverse the judgment of the Court of Appeals.