COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Lorish and Senior Judge Annunziata
Argued at Alexandria, Virginia

UNPUBLISHED

NILS KINUANI

v.      Record No. 0042-22-4

GEORGE MASON UNIVERSITY

MEMORANDUM OPINION[*] BY
JUDGE MARY GRACE O'BRIEN
JANUARY 10, 2023

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David Bernhard, Judge

Nils M. Kinuani, *pro se*.

David G. Drummey, Special Counsel and Senior Assistant Attorney
General (George Mason University Office of University Counsel, on
brief), for appellee.

Nils M. Kinuani (appellant) appeals the Fairfax Circuit Court's ruling dismissing his

appeal of George Mason University's (GMU) administrative decision denying him in-state

tuition rates for the Fall 2020 semester. Appellant first contends that the court's decision was

"arbitrary and capricious as it does not take into consideration the facts and evidence of the

case." He also asserts that the court "erred in disregarding [his] claim that he also qualifies for

in-state tuition rate based upon his pending asylum application."

BACKGROUND

Appellant is a non-United States citizen, who immigrated from the Democratic Republic

of the Congo in 2010. He was admitted to GMU as an undergraduate student in August 2016

and was classified as an out-of-state student. In May 2020, appellant applied for a tuition

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

reclassification for the Fall 2020 semester claiming that he was domiciled in Virginia.[1] Appellant proffered that he had a pending asylum application and submitted a copy of his employment authorization card from the Department of Homeland Security reflecting that he was an asylum applicant. He also submitted various documents to support his claim that he resided in Virginia, including a copy of a lease for an apartment in Springfield.

GMU denied appellant's application for tuition reclassification, finding that he was ineligible for domicile review under the State Council of Higher Education for Virginia's Domicile Guidelines (the SCHEV guidelines) because he did not possess the "legal ability to establish [his] domicile in Virginia based on [his] current immigration status." GMU cited Addendum A of the SCHEV guidelines, which lists the immigration statuses that are eligible for domicile review. Addendum A states, "Pending asylum claims are not eligible for domicile review." GMU noted that although a student who had been granted asylum would be eligible to establish domicile under the SCHEV guidelines, appellant's application for asylum was still pending.[2]

By statute, an institution must provide an appeal process for students "aggrieved by decisions regarding eligibility for in-state or reduced rate tuition charges." Code § 23.1-510(A). This appeals process, not governed by the Administrative Process Act, is composed of three

---

[1] Appellant initially applied for a tuition reclassification for the Summer 2020 semester, but, at the suggestion of a GMU administrator, amended his request to pertain to the Fall 2020 semester, due to a new law—Code § 23.1-505.1 (previously Code § 23.1-506(A)(10))—set to take effect on July 1, 2020. This new provision makes certain qualifying students eligible for in-state tuition at a public Virginia university "regardless of their citizenship or immigration status." Code § 23.1-505.1 provides that any student who attended high school for at least two years in Virginia and either graduated or passed a high school equivalency examination, and who has submitted evidence of Virginia income tax returns for at least two years before the date of registration, is eligible for in-state tuition, regardless of immigration status.

[2] GMU also determined that appellant was ineligible under Code § 23.1-505.1 because he had not attended high school for at least two years in Virginia.

levels of review: "an initial determination, an intermediate review of the initial determination, and a final administrative review." Code § 23.1-510(B), (D). Any student "aggrieved by a final administrative decision" may then petition the circuit court for review. Code § 23.1-510(C).

Appellant sought intermediate review of GMU's initial determination denying him in-state tuition for the Fall 2020 semester and presented a different argument. He argued that because GMU found that he could not establish domicile in Virginia while his asylum application was pending, he necessarily "resided" in his home country of the Democratic Republic of the Congo and should qualify for the domicile exemption in Code § 23.1-506(A)(1).[3] He also submitted supporting documentation that he had been employed full-time in Virginia for at least one year immediately before the first day of classes for the Fall 2020 semester and had paid Virginia taxes on all taxable income during this time.

GMU rejected his appeal, determining that appellant did not qualify for the domicile exemption in Code § 23.1-506(A)(1) because he resided in Virginia. GMU noted that appellant had submitted a copy of his Virginia lease with his initial request for tuition reclassification, and he had provided no documentation that he resided outside of Virginia. GMU acknowledged that appellant's home country was elsewhere, but he was "much like other students who may be domiciled in another state but reside and work in Virginia." Further, GMU continued to find that appellant was ineligible to establish domicile under the SCHEV guidelines because his asylum application was still only pending.

---

[3] Code § 23.1-506(A)(1) provides that certain students "are eligible for in-state tuition regardless of domicile," including "[a]ny non-Virginia student who resides outside the Commonwealth and has been employed full time in the Commonwealth for at least one year immediately prior to the date of the alleged entitlement if such student has paid Virginia income taxes on all taxable income earned in the Commonwealth" for the tax year before the date of the entitlement. These students "shall continue to be eligible for in-state tuition charges for so long as the student is employed full time in the Commonwealth and the student pays Virginia income taxes on all taxable income earned in the Commonwealth." *Id.*

Appellant appealed this determination. In his third and final level of internal review from GMU, appellant claimed he qualified for the domicile exemption in Code § 23.1-506(A)(1) because he resided in Maryland, not Virginia or the Democratic Republic of the Congo. GMU issued a final administrative decision on October 1, 2020, denying appellant in-state tuition for the Fall 2020 academic semester.

Appellant appealed GMU's decision to the circuit court. In an April 23, 2021 order, the court ruled that GMU's final administrative decision "failed to state the facts relied upon for the determination of domicile under Code § 23.1-502 and for the denial of appellant's eligibility for in-state tuition" and remanded the case to GMU "to conduct a final administrative review and to state the facts relied upon in support of the determination reached as a result of that review." After the matter was remanded to GMU, appellant supplemented his appeal to show that he had applied to the Department of Homeland Security for permanent resident status on May 25, 2021.

On remand, GMU issued a final administrative decision, completing its third level of internal review, and again denied appellant in-state tuition. Based on Code § 23.1-503(D) and Addendum A to the SCHEV guidelines, GMU found that appellant was ineligible for domicile review because his pending asylum application did not afford him the "capacity to intend to remain in the Commonwealth indefinitely." GMU also rejected appellant's claim that he qualified for the domicile exemption in Code § 23.1-506(A)(1) because the evidence he submitted in support of his initial application for in-state tuition and his intermediate appeal to show that he resided in Virginia and the Democratic Republic of the Congo was inconsistent with his new claim that he resided in Maryland.

Appellant again appealed to the circuit court. Following a hearing, the court ruled that GMU's final decision denying appellant's request for in-state tuition for the Fall 2020 semester

was not "arbitrary, capricious, or otherwise contrary to law." The court denied appellant's petition and dismissed the matter with prejudice. Appellant asks this Court to reverse.

## ANALYSIS

In an appeal of a determination of eligibility for in-state tuition, the court's "function is only to determine whether the decision reached by the institution could reasonably be said, on the basis of the record, not to be arbitrary, capricious, or otherwise contrary to law." Code § 23.1-510(C). A decision is "'arbitrary and capricious' . . . when it is 'willful and unreasonable' and taken 'without consideration or in disregard of facts or law or without determining principle.'" *Va. Commonwealth Univ. v. Su*, 283 Va. 446, 453 (2012) (quoting *Sch. Bd. of the City of Norfolk v. Wescott*, 254 Va. 218, 224 (1997)). "Whether an administrative decision is 'arbitrary, capricious or otherwise contrary to law' presents a question not of fact but of law," and we review such questions of law de novo. *Id.* at 452.

Code §§ 23.1-500 through 23.1-510 address eligibility for in-state tuition and reduced rate tuition. To be eligible for in-state tuition at a public institution of higher education in Virginia, a student must establish by clear and convincing evidence (1) domicile in Virginia for a period of "at least one year immediately succeeding the establishment of domiciliary intent" and (2) "abandonment of any previous domicile, if such existed." Code § 23.1-502(A); *Su*, 283 Va. at 452. "Domicile" is expressly defined for in-state tuition purposes to mean "the present, fixed home of an individual to which he returns following temporary absences and at which he intends

- 5 -

to stay indefinitely." Code § 23.1-500.[4] "Domiciliary intent" means "present intent to remain indefinitely." *Id.* "No individual may have more than one domicile at a time." *Id.*

In Code § 23.1-510(D), the General Assembly specifically delegated to SCHEV the duty to issue and revise guidelines regarding eligibility for in-state tuition. The statute requires that the SCHEV guidelines be "incorporated by all public institutions of higher education in their admissions applications." *Id.* The purpose of the SCHEV guidelines is "[t]o ensure the application of uniform criteria in administering this section and determining eligibility for in-state tuition charges." *Id.*

Article 1, Section 3 of the SCHEV guidelines provides that "[t]he student bears the burden of establishing, by clear and convincing evidence, that he is a national or an eligible alien. If the student is a national or eligible alien, then the institution shall continue the domicile analysis." The SCHEV guidelines also state that "[i]f the student is neither a national nor an eligible alien, the student is not eligible for further domicile analysis." *Id.* SCHEV "provides supplemental information on forms, definitions, and nonimmigrant categories, including classification as eligible or ineligible alien, in addenda to these guidelines." *Id.* Addendum A to the SCHEV guidelines, titled "Descriptions and Domicile Eligibility Status for Various Categories of Aliens Referenced in the Guidelines for Determining Domicile and Eligible for In-State Tuition Rates," addresses the category of "Asylees/Asylum":

> Asylees are individuals who have been approved for asylum in the United States. Proof of asylum will include either a court order granting asylum, an I-94 card noting asylum, an asylum approval letter from an immigration office, or an Employment Authorization Document (I-766) showing category (a)(5). Such individuals may

---

[4] This statutory codification mirrors the general definition that has always existed in the Commonwealth. "Domicile is defined to be a *residence* at a particular place, accompanied with positive or presumptive proof of an intention to remain there for an unlimited time. To constitute a domicile, two things must concur—first, *residence*; secondly, the intention to remain there." *Long v. Ryan*, 71 Va. 718, 719 (1878) (considering domicile for purposes of where jurisdiction may lie).

> be reviewed for domicile. *Pending asylum claims are not eligible for domicile review*.

*Id.* add. A, at 2 (emphasis added).

In his appeal, appellant raises two assignments of error: (1) that "[t]he Circuit Court of Fairfax County erred in affirming GMU's decision; a decision that is arbitrary and capricious as it does not take into consideration the facts and evidence of the case"; and (2) that "the Circuit Court of Fairfax County erred in disregarding the appellant's claim that he also qualifies for in-state tuition rate based upon his pending asylum application." Appellant does not challenge GMU's decisions with respect to the domicile exemptions he invoked in previous appeals.

At the outset, we note that appellant challenges GMU's decision as arbitrary and capricious, but he does not challenge the validity or legality of the SCHEV guidelines GMU relied on in reaching its ultimate decision. Neither appellant's assignments of error, nor his arguments on brief, address the SCHEV guidelines. "Assignments of error are the core of the appeal." *Forest Lakes Cmty. Ass'n, Inc. v. United Land Corp. of Am.*, 293 Va. 113, 122 (2017). We are "limited to reviewing the assignments of error presented by the litigant." *Banks v. Commonwealth*, 67 Va. App. 273, 289 (2017). "Consequently, we do not consider issues touched upon by the appellant's argument but not encompassed by his assignment of error." *Id.* at 290. Thus, our consideration of his appeal is limited to a review of whether the decision rendered could reasonably said to be arbitrary or capricious.

As GMU stated in its administrative decision, it "acts on behalf of the Commonwealth" and "cannot make exceptions or grant in-state tuition to students who do not meet the specific legal requirements." The SCHEV guidelines explicitly and clearly state that "[p]ending asylum claims are not eligible for domicile review." SCHEV, Domicile Guidelines, add. A, at 2.

The record reflects that GMU considered and primarily relied on the SCHEV guidelines to reach its conclusion that appellant was not eligible for domicile review. Indeed, GMU had no

discretion to disregard the SCHEV guidelines when making its decision, as the guidelines must be "incorporated by all public institutions of higher education in their admissions applications" in order to "ensure the application of uniform criteria in administering this section and determining eligibility for in-state tuition charges." Code § 23.1-510(D).

In light of the foregoing, GMU's decision cannot be characterized as arbitrary or capricious, as it cannot be said to have been made "without consideration or in disregard of facts or law or without determining principle." *Su*, 283 Va. at 453 (quoting *Wescott*, 254 Va. at 224).

Next, appellant argues that GMU's failure to consider his pending permanent residency application rendered the decision arbitrary and capricious. In this appeal, appellant challenges GMU's decision denying him in-state tuition for the Fall 2020 semester; however, appellant did not apply for permanent residence until May 25, 2021. The relevant time frame for establishing domicile was before the date of the alleged entitlement, or the first day of classes for the Fall 2020 semester. Code §§ 23.1-500, -502(A). Appellant's May 25, 2021 application for permanent residency was immaterial to his status in the Fall of 2020. As a result, the circuit court did not err in finding that GMU was not required to consider appellant's permanent residency application.

Finally, appellant argues that the circuit court disregarded his claim that he qualifies for an in-state tuition rate based on his pending asylum application. He argues that "[b]y this application, as combined with all of the domicile factors, appellant has established by clear and convincing evidence that he has the intent to reside indefinitely and permanently in Virginia" because "an asylum application leads to permanent resident status" under federal immigration law if granted—in other words, his asylum application is evidence of his domiciliary intent. Thus, he argues, the circuit court failed to consider how his pending asylum application supported his claim that he possessed domiciliary intent. However, this assignment of error fails

- 8 -

to appreciate that appellant must first have been deemed eligible for a domicile review before any decisionmaker could turn to the issue of whether he possessed the domiciliary intent to remain in Virginia indefinitely. *See* Code § 23.1-502(A); SCHEV, Domicile Guidelines, at 5. GMU found that appellant was not an "eligible alien" to establish domicile, a decision not arbitrary or capricious, and therefore, appellant was "not eligible for further domicile analysis." SCHEV, Domicile Guidelines, at 5.

CONCLUSION

For these reasons, we hold that the circuit court did not err in finding that GMU's denial of appellant's request for in-state tuition for the Fall 2020 semester was not arbitrary or capricious.

*Affirmed*.

Lorish, J., dissenting.

Generally, students must establish domicile in the Commonwealth to qualify for reduced in-state tuition at a public institution of higher education in Virginia. Code §§ 23.1-500 to -510. By statute, institutions must evaluate the totality of the circumstances to decide whether a student has established the requisite domiciliary intent. Code § 23.1-502. In one instance, and one instance only, the General Assembly identified a category of students as lacking the "capacity to intend to remain in the Commonwealth indefinitely" and therefore per se unable to prove domicile. Code § 23.1-503(D). That exclusion, mandated by federal law, includes "any individual holding a student visa or another temporary visa." *Id.* Applicants for asylum are not cited in this exclusion, and so by statute, they should be holistically evaluated for domicile. GMU erroneously interpreted this statute to conclude that an asylum applicant is the same as an individual holding a student or temporary visa and is, therefore, per se ineligible to establish domicile. As this was contrary to law, I would reverse the decision below as an abuse of discretion. Thus, I respectfully dissent.

I. GMU's interpretation of Code § 23.1-503(D) was contrary to law, notwithstanding the SCHEV guidelines.

Rather than engage Kinuani's argument that asylum applicants are not precluded from establishing domicile under Code § 23.1-503(D),[5] the Commonwealth relies on the SCHEV guidelines—specifically the statement that "[p]ending asylum claims are not eligible for domicile review"—and argues that GMU "had no choice but to follow these guidelines," so its decision "was clearly not arbitrary, capricious or contrary to law." The majority opinion likewise concludes that "GMU had no discretion to disregard the SCHEV guidelines when

_____

[5] In a single footnote, the Commonwealth suggests, without citation, that "[a]lthough not relevant for this Court's review," SCHEV's classification of asylum applicants as ineligible is correct because "[a]sylum applicants are merely lawfully present . . . while their applications remain pending" and therefore they cannot establish domicile.

- 10 -

making its decision" because Code § 23.1-510(D) requires the guidelines to be "incorporated by all public institutions of higher education in their admissions applications." I disagree.

GMU was not bound by SCHEV's interpretations.[6] The General Assembly chose to task "institutions of higher education"—not SCHEV—with "determining domiciliary intent" after "consider[ing] the totality of the circumstances" when assessing requests for in-state tuition. Code §§ 23.1-502(B), -510(A). In contrast, SCHEV is directed to "issue and revise domicile guidelines to be incorporated by all public institutions of higher education in their admissions applications" to "ensure the application of uniform criteria in administering this section and determining eligibility for in-state tuition charges." Code § 23.1-510(D).

The specific statutory directive that the SCHEV guidelines are to be "incorporated by all public institutions of higher education in their admissions applications" is limited both by its language[7] and the General Assembly's decision to exempt these guidelines from the Administrative Process Act. Unlike policies or regulations promulgated to carry out SCHEV's duties under Code § 23.1-203, here, the General Assembly expressly exempted domicile guidelines from the Administrative Process Act. *See* Code § 23.1-510(D). Thus, the guidelines lack the force of law. *Compare Va. Ret. Sys. v. Shelton*, 76 Va. App. 167, 182 (2022) (distinguishing agency guidance documents from formal rules and regulations with the force of

---

[6] SCHEV itself recognizes the final decisional authority vested in each institution. On its website page covering "Eligibility for In-State Tuition," SCHEV directs students to "contact directly the domicile officer of their attending institution to discuss available options" for establishing Virginia domicile and notes that "[s]pecific inquiries about domiciliary determination should be directed to the institution a student plans to attend." https://www.schev.edu/financial-aid/in-state-residency (last visited Jan. 6, 2023). The page concludes with: "To learn more about how your circumstances affect your eligibility to establish domicile, please contact the college or university you plan to attend." *Id.*

[7] A plain text reading of the statute only requires institutions to "incorporate" the guidelines "in their admissions *applications*"—which is distinct from an institution's *determinations* about eligibility for in-state tuition.

- 11 -

law), *with Sargent Elec. Co. v. Woodall*, 228 Va. 419, 424 (1984) (where General Assembly has authorized agency rulemaking "[t]he adoption of such rules is a legislative act, and the enactment is binding in law"). Our Supreme Court has already discussed the SCHEV domicile guidelines, along with a SCHEV policy on intra-Commonwealth institutional transfers, and observed that "SCHEV policy . . . is not a statute or an administrative regulation and, thus, does not have the force of law." *Geo. Mason Univ. v. Malik*, 296 Va. 289, 299 (2018).

Indeed, GMU's own actions are telling. While the majority suggests GMU relied primarily on the SCHEV guidelines, in its final decision denying in-state tuition benefits to Kinuani, GMU concluded he was ineligible *under Code § 23.1-503(D)*. After quoting the statute's language that "[a]ny individual holding a student visa or another temporary visa does not have the capacity to intend to remain in the Commonwealth indefinitely and is therefore ineligible to establish domicile," GMU stated, "[y]our pending asylum status does not allow you the 'capacity to intend to remain in the Commonwealth indefinitely and is therefore ineligible to establish domicile and receive in-state tuition charges.'" Having made its own determination based on the governing statute, GMU then merely noted its conclusion was "consistent" with the SCHEV guidelines.

The majority's conclusion that "GMU had no discretion to disregard the SCHEV guidelines when making its decision" would allow SCHEV final say on interpreting statutory language in a policy statement not subject to APA rulemaking or legislative review under Code § 2.2-4014. Instead, the General Assembly provided for judicial review of the *institution*'s decisions on eligibility because the *institution* is tasked with "determining domiciliary intent." For this reason, Kinuani was correct to assign error to GMU's decision as arbitrary and capricious because it was contrary to statute, as set out below. *See Sch. Bd. of City of Norfolk v. Wescott*, 254 Va. 218, 224 (1997) (actions are arbitrary and capricious when taken "in disregard

of . . . law" (quoting *Black's Law Dictionary* 105 (6th ed. 1990))). The majority's suggestion that Kinuani needed to challenge the validity or legality of the SCHEV guidelines assumes its erroneous conclusion that GMU was bound by the guidelines.[8]

II. Code § 23.1-503(D) does not categorically exclude pending asylum applicants from establishing domicile in Virginia.

Rather than review the totality of the circumstances to determine whether Kinuani established domicile in Virginia, GMU found he was per se ineligible to establish domicile because of his pending asylum application.[9] After declaring that "[p]ending asylum claims are not eligible for domicile review," GMU's final decision about Kinuani's eligibility quoted the entirety of Code § 23.1-503(D):

> Any alien holding an immigration visa or classified as a political refugee may establish domicile in the same manner as any other student. However, absent congressional intent to the contrary, any individual holding a student visa or another temporary visa does not have the capacity to intend to remain in the Commonwealth indefinitely and is therefore ineligible to establish domicile and receive in-state tuition charges.

---

[8] Even if Kinuani had directly challenged the SCHEV guidelines in his assignment of error, the majority does not explain how guidelines it concludes are binding could be challenged through an appeal of the *institution's* decision under Code § 23.1-510(C).

[9] By statute, the institution must evaluate whether a student has shown "domiciliary intent" by considering the "totality of the circumstances" including the following applicable factors:

> continuous residence for at least one year prior to the date of the alleged entitlement . . . ; state to which income taxes are filed or paid; driver's license; motor vehicle registration; voter registration; employment; property ownership; sources of financial support; military records; a written offer and acceptance of employment following graduation; and any other social or economic relationships within and outside the Commonwealth.

Code § 23.1-502(B). Judicial review over an institution's weighing of the totality of the circumstances is limited, and the Supreme Court has affirmed an institution's fact-bound determinations in each prior case that has come before it. No case to date, however, has considered whether an institution acted in a manner contrary to law in its interpretation of a statute governing in-state tuition.

- 13 -

GMU relied on that same statutory language to explain to Kinuani that "[y]our current pending asylum status does not allow you the '*capacity to intend to remain in the Commonwealth indefinitely and is therefore ineligible to establish domicile and receive in-state tuition charges*.'" (Emphasis added). Thus, GMU equated pending asylum status with "a student visa or another temporary visa" in interpreting Code § 23.1-503(D).

To evaluate whether GMU's legal determination contradicted the statute, I first look to the language the General Assembly used in excluding "any individual holding a student visa or another temporary visa" from establishing domicile, then consider whether asylum applicants fit within either the plain statutory meaning or the intent of this exclusion.

A. The plain language of the statute lacks any express exclusion for asylum applicants.

The General Assembly enacted the precursor to what is now Code § 23.1-503(D) in 1984, in the immediate aftermath of *Toll v. Moreno*, 458 U.S. 1 (1982),[10] where the Supreme Court considered which categories of nonimmigrant visa allowed an alien to establish domicile in the United States and which did not.

In *Toll*, the Supreme Court struck down a Maryland law that restricted eligibility for reduced in-state tuition to "immigrant aliens lawfully admitted for permanent residence" and

---

[10] These amendments followed the 1984 report of a joint subcommittee of the House Committees on Education, Appropriations and Finance and the Senate Committees on Education and Health and Finance, established to study "The Issue of Determination of Eligibility for Reduced Tuition Charges in the Commonwealth's Institutions of Higher Education" ("1984 Report"). The report discussed the constitutional issues with distinguishing between categories of students and repeatedly examined the Supreme Court's decision in *Toll*. *See* Joint Subcommittee Studying the Issue of Determination of Eligibility for Reduced Tuition Charges in the Commonwealth's Institutions of Higher Education, *The Issue of Determination of Eligibility for Reduced Tuition Charges in the Commonwealth's Institutions of Higher Education*, H. Doc. No. 42 (1984), https://rga.lis.virginia.gov/Published/1984/HD42/PDF. This joint subcommittee proposed the language of the statute that was ultimately adopted, with only minor amendments, as House Bill No. 214.

excluded "nonimmigrant aliens."[11]  Congress set out a list of "nonimmigrant aliens" in 8 U.S.C. § 1101(a)(15) which includes aliens admitted under various types of temporary visa.  By statute, some of these temporary visas require, as a condition of entry, that the immigrant expressly disclaim any intent to establish a domicile in the United States.  In *Elkins v. Moreno*, 435 U.S. 647, 665 (1978), a companion case preceding *Toll*,[12] the Supreme Court reviewed several of those categories.  For example, a "visitor to the United States" is "an alien . . . having a residence in a foreign country which he has no intention of abandoning" and who is coming to the United States for business or pleasure.  *Elkins*, 435 U.S. at 665 (alteration in original) (quoting 8 U.S.C. § 1101(a)(15)(B)).  "Similarly, a nonimmigrant student is defined as 'an alien having a residence in a foreign country which he has no intention of abandoning . . . and who seeks to enter the United States temporarily and solely for the purpose of pursuing . . . a course of study . . . .'"  *Id.* (alterations in original) (quoting 8 U.S.C. § 1101(a)(15)(F)).[13]

Yet the Supreme Court determined that Congress placed "no restrictions on a nonimmigrant's intent" for aliens admitted with G-4 visas for "officers, or employees of . . . international organizations, and the members of their immediate families."  *Id.* at 652, 666. (quoting 8 U.S.C. § 1101(a)(15)(G)(iv)).  Therefore, while "Congress expressly conditioned admission for some purposes on an intent not to abandon a foreign residence or, by implication,

---

[11] An "immigrant" alien is defined as every alien who does not fall within the classes of "nonimmigrant aliens" set out in 8 U.S.C. § 1101(a)(15).

[12] In *Elkins*, the Supreme Court certified the "potentially dispositive" question of "whether G-4 aliens are as a matter of state law incapable of becoming domiciliaries of Maryland" to the Maryland Court of Appeals.  *Toll*, 458 U.S. at 6.  After the certification, but before the Maryland court responded, the University of Maryland adopted a clarifying resolution about the domicile policy.  *Id.*  *Toll* took up the constitutionality of this resolution.  *Id.*

[13] Other categories with similar restrictions include "an alien . . . having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States . . . ," 8 U.S.C. § 1101(a)(15)(H), and "an alien having a residence in a foreign country which he has no intention of abandoning . . . ," *id.* § 1101(a)(15)(J), 1101(a)(15)(M)(i).

on an intent not to seek domicile in the United States," other aliens did not have this restriction. *Id.* at 665.

Because federal law has supremacy in the area of immigration, Congress's decision not to expressly condition other nonimmigrant visas on whether the individual disclaimed an intent to domicile was determinative. The Supreme Court struck down the Maryland regulations which per se precluded G-4 visa recipients from qualifying for in-state tuition because Congress had not precluded them from establishing domicile in the United States. *Toll*, 458 U.S. at 17.

The General Assembly adopted the statutory exclusion at issue in the immediate aftermath of *Toll*: "However, absent congressional intent to the contrary, any individual holding a student visa or another temporary visa does not have the capacity to intend to remain in the Commonwealth indefinitely." Code § 23.1-503(D). In declaring that aliens holding student or other temporary visas could not establish domicile *absent congressional intent to the contrary*, the General Assembly necessarily adopted the categories and restrictions set out in federal immigration law. The 1984 Report confirms that "the *Toll v. Moreno* decision generated much discussion and some consternation," but "the Joint Subcommittee did not wish to generate a statute which would have a possible inherent defect," so they included the proviso "absent congressional intent to the contrary." H. Doc. No. 42, *supra* note 10, at 14. When a temporary visa requires the applicant to disclaim any intent of remaining in the United States, that alien is foreclosed from proving domicile in Virginia because to do so would violate the very terms of the visa.[14]

---

[14] The original draft SCHEV guidelines show the same understanding. The guidelines explained,

> When a foreign national claims that he or she is a Virginia domiciliary, the institution should initially examine the federal immigration documents controlling the alien's purpose and length

Code § 23.1-503(D) was carefully drafted to comply with federal law and exclude only those aliens with student or temporary visas that necessarily could never establish domicile under their visas. The General Assembly included no other per se exclusions from domicile review for other aliens, and no other part of the in-state tuition framework suggests an implied exclusion for asylum applicants.

That Code § 23.1-503(D) expressly identifies aliens "holding an immigration visa" and those "classified as a political refugee" as able to "establish domicile in the same manner as any other student" does not imply any additional exclusions from eligibility. The General Assembly knew how to specifically exclude certain groups of aliens; it did precisely that within the same section of the statute. The statement that these particular aliens should be treated "in the same manner as any other student" instead makes immigration status *irrelevant* for those with immigration visas or refugee status.[15]

Thus, the statute makes certain aliens per se eligible to establish domicile as if they were citizens, and it makes certain aliens per se ineligible to establish domicile. Aliens that do not fall within either category—such as asylum applicants—must prove evidence of domicile under the

> of stay in the United States. The purpose of such examination is to determine whether the alien is required to maintain a foreign residence, as well as the terms and conditions governing the alien's presence in the United States relevant to evaluating the claim of domicile.

H. Doc. No. 42, *supra* note 10, app. C, at 66.

[15] This conclusion is evident from the plain text of the statute and bolstered by the legislative history; this language was added to the statute to prevent universities from granting aliens with immigration visas and those classified as political refugees *automatic* in-state tuition benefits without having to first prove domicile. The joint subcommittee responsible for the language identified as an issue "[s]tudents who are refugees domiciled in another state and who request immediate Virginia status upon moving here," and explains that the proposed legislation would make it clear those students "are required to establish eligibility *just as any other student would be*." H. Doc. No. 42, *supra* note 10, at 9, 13 (emphasis added).

totality of the circumstances, including their immigration status. *See* Code §§ 23.1-502(A), (B). In other words, I agree with Kinuani that an asylum application should be considered "combined with all of the domicile factors" in assessing whether a student has established domicile by clear and convincing evidence.

This is the same way other categories of alien not specifically mentioned in Code § 23.1-503(D) are currently considered for in-state tuition in the Commonwealth. As Kinuani highlights on brief, the SCHEV guidelines consider aliens with a *pending* application for permanent residence to be eligible for domicile review.[16] And under prior guidance from the Attorney General, aliens who qualify for withholding of removal under the federal policy for Deferred Action for Childhood Arrivals (DACA) are eligible to establish domicile in Virginia.[17] Aliens who qualify for DACA lack any formal legal status, similar to applicants for asylum, but are still in a deferred action status where they are not subject to a removal action. Thus, they are not precluded from forming the intent to domicile in Virginia.[18]

---

[16] SCHEV, Domicile Guidelines, add. A, at 1 (2020), https://www.schev.edu/home/showpublisheddocument/86/637800846458530000 ("An alien who has, individually, filed an application for Adjustment of Status, as evidenced by an I-797 Receipt Notice, and the application remains pending with USCIS . . . may be reviewed for domicile."). There is no federal statute or regulation that gives an applicant for Adjustment of Status any legal status. Indeed, because Kinuani filed for Adjustment of Status after the Fall 2020 semester, the record contains an I-797 notice which states in all capital letters: "THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT."

[17] *See* Letter from Attorney General Mark R. Herring to Director, State Council of Higher Education for Virginia, et al. (Apr. 29, 2014), https://www.schev.edu/home/showpublisheddocument/608/637810401492170000.

[18] The SCHEV guidelines already acknowledge and account for the "occasions when a student will change from an eligible alien to an ineligible alien, often due to aging out of a derivative visa or becoming out of status." SCHEV, Domicile Guidelines, at 22, https://www.schev.edu/home/showpublisheddocument/92/637800846467470000 (2021). In this circumstance, SCHEV says the student is eligible for in-state tuition for terms where he was "an eligible alien as of the first day of the term," but would then be an out-of-state student "as of the term in which he is an ineligible alien on the first day of the term." *Id.* at 22-23. In other words,

B. An applicant for asylum need not disclaim an intent to domicile in the United States and may lawfully remain in the United States while the application is pending.

The plain language of Code § 23.1-503(D) does not mention asylum applicants, nor aliens who have been granted asylum. That is no surprise—federal law makes clear that asylum status does not neatly map onto domiciliary intent. Under 8 U.S.C. § 1158(a)(1), an alien *already* "physically present in the United States, or who arrived in the United States . . . irrespective of such alien's status, may apply for asylum." In other words, an alien does not receive a determination on an application for asylum and *then* enter the country. Instead, before seeking asylum, some aliens will have originally entered the United States with legally obtained permission (such as through a visa), while others will have entered without permission. Asylum applications are supposed to be adjudicated within six months of filing. 8 U.S.C. § 1158(d)(5)(A)(iii). "In practice, however, the process can take years." *Somaysoy v. Ow*, 536 F. Supp. 3d 634, 638 (C.D. Cal. 2021); *see also Fangfang Xu v. Cissna*, 434 F. Supp. 3d 43, 55 (S.D.N.Y. 2020) (finding three-year period of delay "well within the range of time that other courts have found to not constitute unreasonable delay" and collecting cases finding delays of four and five years to be reasonable).

Someone seeking asylum must establish that they qualify as "a refugee within the meaning of section 1101(a)(42)(A)" of Title 8. 8 U.S.C. § 1158(b)(1)(A). By definition, such an alien "is outside any country of such person's nationality . . . and . . . is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on

---

SCHEV has guidance in place for institutions to assess whether to adjust eligibility after a pending asylum application is denied.

account of race, religion, nationality, membership in a particular social group, or political opinion."[19]  *Id.* § 1101(a)(42)(A).

When someone files an asylum application, it does not give them "lawful immigration status."  *See* 8 C.F.R. § 245.1(d)(1).  "[O]nly upon the granting of asylum does a person gain legal status sufficient to adjust status (although, because the grant of asylum confers a green card, asylees rarely apply to adjust status separately)."  *Somaysoy*, 536 F. Supp. 3d at 638.  But, whenever a "bona fide application for asylum is pending," the alien "is in an *authorized period of stay* and does not accrue unlawful presence for purposes of section 212(a)(9)(B) of the Act unless the alien is employed without authorization while the application is pending."[20]  The statutory scheme makes clear that someone with a pending asylum application "is not considered to be present in this country unlawfully."  *Fuanya v. United States*, 2022 WL 1027149, at *5 (D. Colo. Apr. 6, 2022).  Consistent with these basic principles, when USCIS acknowledged receipt

---

[19] While an asylum applicant must meet the statutory definition of "refugee," that alone does not ensure that the Attorney General will exercise discretion in granting asylum.  Asylum applicants differ from those admitted to the United States as "refugees"—a status governed by a separate set of regulations and processes.  Refugees "may apply for admission" from outside the United States if they receive "a referral to the U.S. Refugee Admissions Program," typically from the United Nations High Commissioner for Refugees (UNHCR), a United States Embassy or designated non-governmental organization.  8 C.F.R. Part 207 is the regulation pertaining to refugees.  It explains the application process is governed by 8 C.F.R. § 1.2, which in turn refers to instructions "prescribed by USCIS or other DHS immigration components on their official Internet Web sites."  *See Refugees*, U.S. Custom and Immigration Services (2022), https://www.uscis.gov/humanitarian/refugees-and-asylum/refugees; *The United States Refugee Admissions Program (USRAP) Consultation and Worldwide Processing Priorities*, U.S. Custom and Immigration Services (2021), https://www.uscis.gov/humanitarian/refugees-and-asylum/usrap.  In contrast, asylum applications are covered by 8 C.F.R. Part 208, which requires an applicant to file Form I-589.  *See also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 433 (1987) (explaining the distinction between the admission of refugees and asylum applications).

[20] USCIS,  Memorandum from Donald Neufeld et al. to Field Leadership, No. HQDOMO 70/21.1, at 29 (May 6, 2009), https://www.uscis.gov/sites/default/files/document/memos/revision_redesign_AFM.PDF (emphasis added).  The Commonwealth, on brief, agreed that "[a]sylum applicants are . . . lawfully present."

of Kinuani's asylum application, the written response stated: "You may remain in the U.S. until your asylum application is decided."

Several courts that have examined the unique status of the asylum applicant have concluded that "[a]s an applicant for asylum, [an alien] possesses, not the bare intent, but a *lawful* intent, to remain in [a given state] indefinitely." *Coyoy v. United States*, 526 F. Supp. 3d 30, 41 (D.N.J. 2021).[21] Noting that "[t]he government does not seem to dispute that while her application for asylum is pending," an applicant "is lawfully permitted to remain in the United States indefinitely," the *Coyoy* court found that an "application for asylum is 'an objective and official manifestation of [one's] intent to reside permanently in the United States.'" *Id.* at 41-42 (quoting *Luna v. United States*, 2021 WL 673534, at *2 (W.D. Wash. Feb. 22, 2021)). For these same reasons, another court explained that since "'domicile' can be established by an 'intent to remain' that is 'legal under immigration laws,'" it does not require "[p]ermanent resident status." *Flores v. United States*, 108 F. Supp. 3d 126, 131 (E.D.N.Y. 2015) (quoting *Lok v. INS*, 681 F.2d 107, 109 (2d Cir. 1982)). Thus, asylum applicants could establish domicile. *Id.*

"The very fact of applying for asylum itself shows [the alien] intends to remain in this country if his application is granted." *Fuanya*, 2022 WL 1027149, at *5. Thus, while such an application "remains pending, [an alien] can establish an intent to remain which is lawful under immigration law, and thus can establish domicile." *Id.*; *see also Tanyike v. United States*, 2022 WL 1524995, at *4 (S.D. Ohio May 13, 2022) (finding that the asylum applicant was not in the country unlawfully and that the fact he "has applied for asylum status demonstrates that he has intent to remain in this country and to do so using the lawful means provided by the laws of the

---

[21] These federal courts were analyzing domicile under 28 U.S.C. § 1391(c)(1), a federal venue statute which stated that "a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled."

United States"); *In re Mendoza*, 597 B.R. 686, 693-94 (Bankr. S.D. Fla. 2019) ("an immigrant legally can form the permanent intention required to establish a U.S. domicile if the immigrant lawfully can reside in the U.S. indefinitely" under an application for political asylum); *Morel v. INS*, 90 F.3d 833, 839 (3d Cir. 1996) (confirming that asylum refugees can establish domicile), *vacated on other grounds*, 144 F.3d 248 (3d Cir. 1998).[22]

Returning to Code § 23.1-503(D), while some applicants for asylum could theoretically also hold a student or other temporary visa, not all applicants for asylum have such a visa. And unlike the visa categories that require an alien to maintain their prior domicile, an asylum applicant necessarily intends to give up a prior domicile by attesting to the fact that they are "unable or unwilling to return to" their country of nationality due to past persecution or the well-founded fear of future persecution. Thus, the statute does not categorially exclude asylum applicants.

CONCLUSION

I find that GMU's determination that Kinuani was per se ineligible to establish domicile because he was an asylum applicant is contrary to law. Code § 23.1-503(D) identifies specific categories of aliens that are per se ineligible to establish domicile, but pending asylum applicants do not fall into any of these categories. When a "statute authorizes the use of discretion," and an agency's "policy guidelines allow no discretion to be exercised," the agency's guidelines are

---

[22] In this way, asylum applicant status is indistinguishable from aliens with a withholding of removal. "Although a withholding of removal is a right not to be removed to a specific country rather than an unqualified right to remain in the United States, it does not lapse after a set amount of time." *Alvarado v. United States*, 2017 WL 2303758, at *4 (D.N.J. May 25, 2017) (citation omitted). Therefore someone with a withholding of removal is "lawfully present" and "has exhibited an intent to stay here indefinitely." *Id.* Likewise, someone paroled into the United States "while awaiting a determination on his requests for withholding of removal and protection under the Convention Against Torture Act" is "lawfully present in the United States and has taken steps under the immigration laws that objectively manifest an intent to make permanent his residence here." *Luna*, 2021 WL 673534, at *1-2.

"inconsistent with the statute" and must give way to the "discretionary standard enacted" by the legislature. *Woods v. Commonwealth, Dept. of Motor Vehicles*, 26 Va. App. 450, 458-59 (1998). Under Code § 23.1-502(B), GMU was *required* to exercise its discretion under the "totality of the circumstances," including all the listed statutory factors, for pending asylum applicants seeking in-state tuition, and it failed to do so. Therefore, I would reverse and remand for GMU to consider all the circumstances—including Kinuani's then-pending asylum application—to determine whether he rebutted the presumption that he was in the Commonwealth for educational purposes by clear and convincing evidence. *See* Code § 23.1-503(G).